EMMA H. KURRISS *vs.* CONRAD & CO., INC.

Suffolk.   October 7, 1942. — December 30, 1942.

Present: FIELD, C.J., LUMMUS, QUA, DOLAN, & COX, JJ.

*Sale*, Warranty, Parties.  *Proximate Cause.*  *Pleading, Civil*, Declaration.

A woman might be found to be the purchaser of a dress at a store where she examined it, tried it on and took it away, although, as a matter of convenience, the dress was charged to a relative's account at the store and the sales slip was made out to the relative, instead of being paid for in cash by the woman.

Evidence that upon a woman's wearing a new dress a "contact dermatitis" appeared on exactly the parts of her body which came into contact with the dress, that color came off the dress onto her body, and that she had never had skin ailments before, with medical testimony that the dress was the cause of the dermatitis, warranted a finding that it was such cause although there was no direct evidence that it contained an injurious substance.

A count in a declaration failed to state a cause of action for breach of implied warranty of fitness under the sales act where it contained no allegation of disclosure of the purpose of the purchase to the seller or of reliance by the purchaser upon the seller's skill and judgment.

Evidence, that a woman at a store asked for a certain type of dress and tried on and purchased one which the clerk showed her and which caused "contact dermatitis" when she wore it, warranted a finding that within G. L. (Ter. Ed.) c. 106, § 17 (1), she relied on the seller's skill and judgment not to sell her a dress containing a latent injurious substance.

CONTRACT OR TORT.   Writ in the Superior Court dated June 2, 1939.

The first and third counts of the declaration were as follows: "Count 1.   The plaintiff says that on December 24, 1938, she bought from the defendant a certain dress to be worn by her; that the defendant impliedly warranted that said dress was reasonably fit to be so worn; that after purchasing said dress as aforesaid the plaintiff wore the same; that said dress was not reasonably fit to be so worn because it contained a certain poisonous dye or other substance which poisoned the plaintiff's body, as the result of which the plaintiff" sustained damage; "and the plaintiff

further says that due notice of said breach of warranty was given the defendant." "Count 3.   And the plaintiff says that on or about December 24, 1938, she bought from the defendant a certain dress to be worn by her, which purpose was made known to the defendant; that in the selection of said dress the plaintiff relied upon the skill and judgment of the defendant and that the defendant impliedly warranted that the said dress was of merchantable quality and free from defects, but that the said dress in truth was not of merchantable quality in that when worn it caused injury to the plaintiff, and the plaintiff thereby" sustained damage. "And the plaintiff further says that due notice of said breach of warranty was given to the defendant."

The action was tried before *Walsh*, J., who ordered verdicts for the defendant on the second and third counts and, after a verdict for the plaintiff on the first count, ordered entered a verdict for the defendant under leave reserved. The plaintiff alleged exceptions.

*H. J. Williams*, (*F. A. Daly & B. J. Killion* with him,) for the plaintiff.

*B. A. Sugarman*, for the defendant.

Cox, J.   The plaintiff contends that there was error in directing a verdict for the defendant on her third count and also on the first count upon leave reserved.   The first count, in substance, alleges that the plaintiff bought a dress from the defendant, which impliedly warranted that it was reasonably fit to be worn, but that it was not, for the reason that it contained a certain poisonous dye or other substance which poisoned her body.   The third count alleges that the purpose of the purchase was made known to the defendant and that, in the selection of the dress, the plaintiff relied upon the skill and judgment of the defendant, which impliedly warranted that the dress was of merchantable quality and free from defects, but that it was not.

It could have been found that the plaintiff went to the defendant's store with her sister, where she examined a number of dresses hanging on a rack, but found nothing that she was looking for.   One of the defendant's clerks then asked her what she was seeking and was informed that she

wanted "something more of a print type of dress than this. This is rather a bit heavy." The clerk asked for the plaintiff's size and said that she would see what she could find for her, adding, "I think I have something very new that just has come in. I will see what size it is. I think you might like it." The clerk went to another room and returned with a print dress which the plaintiff tried on and "purchased" under the following circumstances. She "took out her money to pay for the dress," and the clerk began to make out a sales slip. The plaintiff's sister, who had a charge account with the defendant, suggested that as the plaintiff might need some extra money during the holidays, she might charge the dress to her account. The plaintiff decided to do this, and the clerk was so instructed and made out a sales slip for the charge transaction, in the name and address of the plaintiff's sister, and in which it is stated that the dress was purchased by the sister. The dress was then delivered to the plaintiff, who took it to her home.

The plaintiff wore the dress for about two hours on the next day, which was Christmas. On New Year's Eve she wore it for about five hours. On New Year's Day she wore it while attending a moving picture performance. In the theatre she kept on her fur coat for a while and was conscious that she perspired more or less. Other articles of clothing that she had on had been worn by her for a considerable period, with the exception of a slip, which did not come in direct contact with any portion of her body. Before she left the theatre, she began to experience an occasional itching on her back and neck. The dress was described as covering her back and neck and as having a "V" neck and sleeves extending to the elbow. When she reached her home, the itching sensation had increased. She then took off her clothes and washed herself with soap and water, but did not use any new soap. She used a wash cloth and observed that in washing her neck and the upper part of her back, there was a pink color on the wash cloth that was the same shade of pink as appeared in the dress. She washed the affected areas several times, using soap and water at first, and then witch hazel. There was a pinkish discoloration on her neck

and on portions of her back, shoulders and arms. The next day the "itch" extended over her shoulders and chest, and she observed a pink rash, characterized by blotches, extending over her back and chest and covering exactly the areas that were in direct contact with the dress that she had worn the previous evening. She observed that there was no discoloration or itch on any portion of her body that had not been in direct contact with the dress. Later on, the rash extended down her arms and upward from her neck to her ears, so that the rash and "itchiness" covered those areas of her body that had been in direct contact with the dress and "also the following areas, the back of her neck up to her ears and her arms from the elbows to her wrists." She consulted a physician. On a subsequent visit to another physician she wore the dress and coat that she had worn when she was in the theatre. Upon his advice, she "discarded" the dress, and under his treatment, she gradually recovered. At the time she bought the dress, her health was good and she had never before had any skin ailments.

The dress in question was "delustered" rayon, that is, a rayon from which the luster had been taken so as to make it look like wool or cotton. The plaintiff had worn colored rayon dresses before. There was medical testimony that the plaintiff's skin disclosed a definite dermatitis, which stopped at a straight line across the chest at exactly the level or height to which the underclothes came that the plaintiff was wearing; that the plaintiff's physical examination was negative, except for the skin; that contact dermatitis is classified in the allergy group of disturbances which are not due to anything taken in or inhaled, but are due to something with which the skin comes in contact, and that in the opinion of the witness the cause of the plaintiff's dermatitis was the dress that she purchased.

The defendant contends that, upon this evidence, the sale was made to the plaintiff's sister and that, as a consequence, the contract not having been made with the plaintiff, she cannot recover. See *Gearing* v. *Berkson*, 223 Mass. 257, 260. We are of opinion, however, that this contention cannot be maintained. Up to the time the sales slip was

about to be made out, there seems to have been no question but that the plaintiff was the intended purchaser. She was looking for a dress. She tried it on. She "purchased" it and it was delivered to her. We think that a sale to the plaintiff could have been found, and that what the defendant undertook to do was to look to her sister for payment.

The record discloses no direct evidence that the dress in question contained any poisonous dye, or anything else that would injure the skin, and the defendant contends that the case at bar comes within the case of *Bradt* v. *Hollaway*, 242 Mass. 446. In that case it was said that the record failed to disclose a case of external poisoning that was due to some noxious substance in the dyed fur which the plaintiff alleged was the cause of the condition of her skin. In that case there was no analysis of the dye, and the plaintiff's physician testified that her skin was so hypersensitive that it reacted unduly to irritation of any sort, and that, in his opinion, the plaintiff's inflammation was due to the length of the fur. In that case there was no evidence that the dye came off the fur or that it "crocked." In the case at bar, however, there was evidence of a pink discoloration on the plaintiff's body where the dress had come in contact with it. When the plaintiff washed, there was the same shade of pink on the wash cloth that appeared in the dress. It could have been found that the plaintiff had never before had any skin ailments, and that, apart from the dermatitis, her physical examination was negative. There was evidence that the dress in question was the cause of her "contact" dermatitis. The case at bar, in this respect, is more like *Flynn* v. *Bedell Co. of Massachusetts*, 242 Mass. 450, 454. We think the inference was warranted that the dress in question was the cause of the plaintiff's dermatitis. *Barringer* v. *Ocean Steamship Co. of Savannah*, 240 Mass. 405, 408. *Johnson* v. *Kanavos*, 296 Mass. 373, 375–376. *Flynn* v. *Growers Outlet, Inc.* 307 Mass. 373, 376, 377. Compare *Monahan* v. *Economy Grocery Stores Corp.* 282 Mass. 548, 550.

Although there was evidence that contact dermatitis is classified in the "allergy" group of disturbances, the record discloses nothing as to what is meant by this. It is consist-

ent with the testimony as to this classification that what is meant is that the dermatitis is something that is not "due to anything taken in or inhaled but . . . to something that the skin comes in contact with." We are of opinion that there is nothing in this specific piece of evidence which requires a finding for the defendant, if in other aspects of the possible findings the plaintiff is entitled to recover. See *Bianchi* v. *Denholm & McKay Co.* 302 Mass. 469.

It appears from the record that the declaration originally consisted of two counts, the first being as already described, and the second being for negligence. The plaintiff has not contended that the directed verdict on the second count was not ordered properly.

The third count, to which reference has been made, was added by amendment, and it seems apparent that it is drawn with the end in view of stating a case under G. L. (Ter. Ed.) c. 106, § 17 (1), although the allegation is that the defendant impliedly warranted that the dress was of merchantable quality and free from defects. As we read the plaintiff's first count, it amounts to an allegation of an implied warranty of fitness, without any allegations as to the purpose of the purchase being made known to the defendant, or of any reliance of the plaintiff upon the skill and judgment of the defendant. We think there was no error in directing a verdict on this count, the allegations of which, in our opinion, do not state any case under the provisions of G. L. (Ter. Ed.) c. 106.

General Laws (Ter. Ed.) c. 106, § 17 (1) provides as follows: "Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment, whether he be the grower or manufacturer or not, there is an implied warranty that the goods shall be reasonably fit for such purpose."

The adoption of the uniform sales act was not merely a codification of the existing rules regarding sales in this Commonwealth. It was a design, so far as possible, to make our law uniform with that of other States which should adopt acts containing corresponding provisions. The title of the

sales act, when enacted by St. 1908, c. 237, was "An Act to make uniform the law relating to the sale of goods." It is true that, where the act contains language substantially as has appeared in our cases, in interpreting the act, such cases are of great importance. But after all, it is the provisions of the act itself that must call for interpretation whenever involved in any case. In *Barnard* v. *Kellogg,* 10 Wall. 383, 388, the familiar rule of the common law was stated to be as follows: "No principle of the common law has been better established, or more often affirmed, both in this country and in England, than that in sales of personal property, in the absence of express warranty, where the buyer has an opportunity to inspect the commodity, and the seller is guilty of no fraud, and is neither the manufacturer nor grower of the article he sells, the maxim of *caveat emptor* applies. Such a rule, requiring the purchaser to take care of his own interests, has been found best adapted to the wants of trade in the business transactions of life. And there is no hardship in it, because if the purchaser distrusts his judgment he can require of the seller a warranty that the quality or condition of the goods he desires to buy corresponds with the sample exhibited. If he is satisfied without a warranty, and can inspect and declines to do it, he takes upon himself the risk that the article is merchantable. And he cannot relieve himself and charge the seller on the ground that the examination will occupy time, and is attended with labor and inconvenience. If it is practicable, no matter how inconvenient, the rule applies." This rule finds expression in many of our own cases, one of the earliest of which is *Winsor* v. *Lombard,* 18 Pick. 57, 59, 60. In that case, Chief Justice Shaw referred to one modification that had already come about in this Commonwealth, where a person who sells goods of a certain denomination or description, undertakes as part of his contract, that the thing delivered corresponds to the description. (Page 60.) See *Mixer* v. *Coburn,* 11 Met. 559, 562; *Howard* v. *Emerson,* 110 Mass. 320; *Hight* v. *Bacon,* 126 Mass. 10, 12.

It is unnecessary to trace the development of the law in its relation to manufacturers and growers, or to cases where

there has been no inspection or opportunity to inspect the goods that were subject matter of the sales, or to more than refer to cases where food to be eaten has been sold. See *Farrell* v. *Manhattan Market Co.* 198 Mass. 271. It was said in the case just cited, at page 279: "A contract for the supply of food without stating the purpose for which the food is required stands on the same footing as a contract to supply other articles when the particular purpose for which they are wanted has been stated to the dealer."

The case at bar is one in which, by common consent of the parties, the subject matter of the sale was something not inherently dangerous, and of which the plaintiff certainly had an opportunity to make an examination. We think, however, that it cannot be contended that a reasonable or practicable examination of the dress by the plaintiff, would or could have disclosed that it contained something that ought not to have been in it, that is, something that caused the plaintiff's injuries. Said § 17 (1) contains two vital requirements: (1) that the buyer, expressly or by implication makes known to the seller the particular purpose for which the goods are required, and (2) that it appears that the buyer relies on the seller's skill or judgment. There can be no doubt under our decisions that in the case at bar it could have been found that the plaintiff established the first requirement. *Holt* v. *Mann*, 294 Mass. 21, 23, 24, and cases cited. The vital question, as we view it, is whether it could have been found that she established the second requirement. We are of opinion that the evidence, as to what took place between the plaintiff and the defendant's clerk, in and of itself, does not establish reliance, apart from what is hereinafter said. It is true that it could be found that the clerk selected the dress which the plaintiff tried on and purchased. But we think that the fair import of this testimony is that in the last analysis it was the plaintiff who made the decision, and that it was she who made the selection.

The case of *Farrell* v. *Manhattan Market Co.* 198 Mass. 271, was an action of tort for negligence in the sale of food, and the declaration alleged that there was an implied war-

ranty that it was fit for food. It was assumed that an action of tort could be maintained for a breach of a warranty. (Page 274.) (See, however, *DePasquale* v. *Bradlee & McIntosh Co.* 258 Mass. 483, 488.) And it was held, after an exhaustive review of cases in England and this country, that a verdict for the defendant was rightly ordered, inasmuch as there was no evidence that would warrant the submission to the jury of the question whether the plaintiff relied on the skill and judgment of the salesman in the selection of the food, as to which she had the burden, that the defendant was not liable if he believed the food to be wholesome, and that there was no evidence that he did not so believe. This case was decided in 1908, before our sales act became operative. (See pages 279–281.)

In *Ward* v. *Great Atlantic & Pacific Tea Co.* 231 Mass. 90, it was said that the statement of the law in the *Farrell* case, "which is but an amplification so far as relates to the case at bar, of the terms of the sales act, governs the facts . . . presented [in the *Ward* case]." In that familiar case, the plaintiff purchased, at the defendant's store, a can of baked beans. The plaintiff, while eating the beans, broke his tooth on a small pebble of which he had no knowledge, that was in the can. It was not expressly stated in the agreed facts that the defendant selected the can for delivery to the plaintiff, or that the latter relied on the skill and judgment of the defendant in selecting the can for delivery, but it was said: "But that he did so rely seems an almost irresistible inference from the facts stated. The cans in the defendant's stock were all alike in label and in general appearance. The cans were sealed. Their contents could not in the nature of things be open to inspection before the sale. There could be no intelligent selection based upon any observation by the purchaser. There is no room for the exercise of individual sagacity in picking out a particular can. The customer at a retail store is ordinarily bound to rely upon the skill and experience of the seller in determining the kind of canned goods which he will purchase, unless he demands goods of a definite brand or trade name. The situation is quite different from the choice of a fowl or a piece of meat from a

larger stock, all open to inspection, where there is opportunity for the exercise of an independent judgment by both the buyer and the seller, and where, therefore, the fact as to the one who makes the selection is of significance, as in the Farrell case. The case at bar must be treated on the footing, as matter of necessary inference arising from the relation of the parties, so far as that is material in view of the other facts, that the plaintiff relied upon the knowledge and trade wisdom of the defendant in purchasing the can of beans. In the absence of an express statement to the contrary, this must be regarded as a necessary inference from the relation of the parties." (Pages 93–94.) One important point to be observed in the *Ward* case is that it did not appear that the defendant selected the can for delivery to the plaintiff. Another is that it did not expressly appear that he relied upon the skill and judgment of the defendant in selecting the can. In connection with this last point, it is to be observed that said § 17 (1) says nothing about the buyer relying on the seller's skill or judgment in selecting the article that is the subject matter of the sale. All that must appear is that he relies "upon the seller's skill and judgment." With this in mind, it follows that the *Ward* case holds that the buyer of canned goods relies upon the skill and judgment of the seller in the general selection by him of the canned goods which he offers for sale. Stress in the *Ward* case is laid upon the fact that in the purchase of canned goods there is no opportunity for the exercise of an independent judgment by the buyer, and that in the sale of such goods "as matter of necessary inference arising from the relation of the parties, so far as that is material in view of the other facts, that the plaintiff relied upon the knowledge and trade wisdom of the . . . [seller] in purchasing the can of beans." (Page 93.) Four justices of the court concurred in the *Ward* opinion. Crosby, J., wrote a dissenting opinion, and apparently Loring, J., and Pierce, J., did not sit. Perhaps it should be observed that in the *Ward* case, the can of beans had a label on which appeared the designated name or brand of the beans. The dissenting opinion in that case must have called the attention of the majority to the suggestion that

their opinion might be regarded as something of an innovation in the interpretation of the language of § 17 (1) as to the matter of reliance upon the skill and judgment of the seller. The majority, apparently in answer to this suggestion, the opinion being by Rugg, C.J., pointed out that by their interpretation of these words, responsibility is placed on the party to the contract "best able to protect himself against original wrong of this kind, and to recoup himself in case of loss, because he knows or comes in touch with the manufacturer. . . . The retail purchaser in cases of this sort ordinarily would be at some disadvantage if his only remedy were against the manufacturer." (Page 94.) We follow the decision in the *Ward* case. It holds that reliance upon the seller may arise by implication from the facts in the case.

A few years after the *Ward* case was decided, there came the case of *Flynn* v. *Bedell Co. of Massachusetts*, 242 Mass. 450. In that case, already referred to, there was a sale at retail to the plaintiff of a brown velours coat which had a fur collar. The action was contract or tort, and the question considered was whether there was an implied warranty of fitness under said § 17 (1). The plaintiff's injuries, a skin disease, evidently were found by the jury to be due to poisonous or noxious substances transmitted from the dyed fur collar. It was held that the case was rightly left to the jury on the question of implied warranty. Among other things, it was said: "The element of 'fitness' was bound up with the question of whether the fur was dyed, and possibly contained latent defects dangerous to the wearer. It was from this that the injury to her ultimately flowed. . . . Notwithstanding that the plaintiff participated to some extent in the selection of the garment, we cannot say that there was no evidence to warrant a jury in finding that she bought in reliance upon the seller's skill and judgment that the fur in the collar was natural rather than dyed, and safe rather than unsafe; and that the seller was reasonably apprised of that fact." (Page 453.) It is true that there was evidence in that case that the plaintiff inquired of the clerk as to the kind of fur, and that she was told that it was not

a dyed fur, and that she testified that she had no experience with furs prior to that time. It is true that the court said that "Something more appears here than the ordinary choice of a ready-made garment, where the buyer relies wholly on her own selection as to material, color, style, etc." No doubt what the court said about the element of "fitness" being bound up with the question whether the fur was dyed and possibly contained latent defects dangerous to the wearer was based upon this evidence. But the case seems to say that in the purchase of an article, the reliance by the buyer that is a requisite under § 17 (1) need not necessarily be a total reliance, but that on the contrary, the buyer may rely on his own judgment as to some matters, and on the skill and judgment of the seller as to others.

The case of *Rinaldi* v. *Mohican Co.* 225 N. Y. 70, was one of a sale of pork that was infested with trichinae. The plaintiff ate it and was made ill, and it was held that she could recover for breach of implied warranty of fitness. One question submitted to the jury was whether she could have found the defect in the meat if she had used reasonable care. In considering the question whether the plaintiff had a right to rely upon the skill and judgment of the defendant, it was said that the court did not lay stress on the question whether the article was selected by the buyer or the seller; that this might or might not be important; and that if the buyer selected one chicken from twenty offered him, exercising his judgment as to its "wholesomeness," clearly he might not rely upon the dealer's skill. "But where the buyer selects one of the twenty for some reason unconnected with its fitness for food and exercising and having no judgment on that question — makes the selection because the color is pleasing or the weight suitable, then he is relying upon the dealer no less than when the selection is made by the latter. He assumes that the dealer knows and has the means of knowing that all are fit for food. It is a matter about which ordinarily the purchaser knows and can know nothing." (Page 74.) In *Grant* v. *Australian Knitting Mills, Ltd.* [1936] A. C. 85, the plaintiff purchased woolen underwear from a retailer and con-

# KURRISS *v.* CONRAD & CO., INC.  [312

tracted dermatitis from wearing it. It appeared that there was a chemical irritant in the garments. The relevant provisions of the English sales act are, in general, similar to those contained in ours. It was held that there was a breach of warranty of fitness, and for that matter, a breach of warranty treating the sale as one by "description." (See G. L. [Ter. Ed.] c. 106, § 17 [2].) The discussion in the opinion as to the breach under what substantially corresponds to our § 17 (1) was mainly confined to the question whether the purpose for which the goods were purchased was made known to the seller. But it was held that the conversation in the shop in which the buyer discussed questions of price and of different makes, "did not affect the fact that he was substantially relying on the retailers to supply him with a correct article," and it was held that the requirements of the section were complied with. (Page 99.)

In *Rinaldi* v. *Mohican Co.* 225 N. Y. 70, the question whether an inference of reliance would be drawn upon a sale in the original package as bought by the vendor from others was left open. In *Ryan* v. *Progressive Grocery Stores, Inc.* 255 N. Y. 388, 391, this question, however, was considered, and it was pointed out that under the provisions of the sales act in the case of a sale of a specified article under its patent or other trade name, there is no implied warranty as to its fitness for any particular purpose. See *Botti* v. *Venice Grocery Co.* 309 Mass. 450, 453, 454. In the *Botti* case, the question now under consideration did not arise directly. See *Rogiers* v. *Gilchrist Co., ante,* 544.

Obviously the case at bar, on the facts, is different from the *Flynn* case. Here there is no such evidence by way of inquiry as appeared in that case, and the question is squarely presented whether the plaintiff, by implication, had a right to rely upon the expectation that she would not be sold a dress that contained some deleterious substance, not observable or discoverable upon reasonable examination by her, which would cause her injuries.

We think it may be assumed that the defendant did not intend to sell and that the plaintiff did not intend to pur-

chase such a garment. If the plaintiff has no remedy by way of implied warranty of fitness, perhaps it can be said that the result follows from a commercial transaction. Perhaps this is what prompted Loring, J., to say, in the *Farrell* case, that the only implied warranty at common law in such a case is that the seller believes that the goods are sound. We think that the provisions of said § 17 (1) should be construed to go beyond this, and that where, as in the case at bar, in a sale over the counter of an article that is open to inspection, but where any practicable inspection would not disclose an unsound condition, the plaintiff, by implication, has a right to rely upon the skill and judgment of the seller. It may be that so to hold is to go a step beyond the decisions in the *Ward* and *Flynn* cases. Perhaps it is not so long a step ahead of the *Ward* case as the *Flynn* case. But if it makes no difference who selects a can of baked beans that contains a foreign substance on the question of the buyer's right to rely upon the seller, it is difficult to see why it makes any difference in the case of the sale of a dress that contains a dangerous, latent defect.

Accordingly, we are of opinion that the exception to the directed verdict on the first count must be overruled, but that the exception to the direction of a verdict on the third count must be sustained.

*So ordered.*