376 P.2d 41

**VITRO CORPORATION OF AMERICA,**
Plaintiff-Appellant,

v.

**TEXAS VITRIFIED SUPPLY COMPANY,**
and Texas Vitrified Pipe Company,
Defendants-Appellees.

No. 7014.

Supreme Court of New Mexico.

Nov. 8, 1962.

Rodey, Dickason, Sloan, Akin & Robb and William C. Schaab, Albuquerque, for appellant.

H. Elfred Jones, Carrizozo, Turner, Rodgers, Winn, Scurlock & Terry, Lon Sailers, Dallas, Tex., for appellees.

GEORGE L. REESE, Jr., District Judge.

The trial court sustained a motion for summary judgment made by the appellees under Rule 56, Rules of Civil Procedure, after the issues were joined by complaint and answer and on the basis of depositions and answers to interrogatories.

The complaint insofar as material, reads as follows:

"3. On or about September 21, 1958, the Village of Ruidoso, New Mexico, solicited bids from the plaintiff and others for the construction of sewage treatment plant and sanitary sewer system according to plans and specifications prepared by Wilson & Co., Engineers, Albuquerque, New Mexico (hereinafter sometimes referred to as the Ruidoso job).

"4. The plaintiff, through the Refinery Engineering Co. division, negotiated with the defendants with respect to the purchase from them of vitrified pipe, joints, joint wyes, and other materials needed in the prosecution of the Ruidoso job.

The price for such materials agreed upon in such negotiations was used and relied upon by the plaintiff in submitting its bid on the Ruidoso job.

"5. The plaintiff, through the Refinery Engineering Co., division, was awarded the contract for the Ruidoso job, and such contract was signed by the parties on February 13, 1959. Prior thereto on January 30, 1959, the plaintiff had issued its purchase order, No. 5710-16, a copy of which is annexed hereto as Exhibit A, to Texas Vitrified Supply Company for materials required for the Ruidoso job in the aggregate amount of $88,653.71. On March 3, 1959, Supplement No. 1 to Purchase Order 5710-16 was issued by the plaintiff to Texas Vitrified Supply Company for joints, tees, and other materials in the aggregate amount of $326.59. On June 10, 1959, Supplement No. 2 to Purchase Order 5710-16 was issued to Texas Vitrified Pipe Company for joints in the aggregate amount of $407.41. Copies of such supplementary purchase orders are annexed hereto as Exhibits B and C, respectively.

"6. The defendants duly delivered pipe, joints, and other materials specified in the aforesaid purchase orders to the job site near Ruidoso, New Mexico, and the plaintiff duly paid all amounts payable to the defendant in respect of such materials.

"7. The plans and specifications for the sanitary sewer system specified that pipe used for such system would be non-infiltratable within specified tolerances. The defendants had access to such plans and specifications and knew or should have known of such requirements.

"8. Pipe, joints, and other materials sold by the defendants to the plaintiff were required to conform to the plans and specifications of the Ruidoso job. Plaintiff believed at all times prior to final inspection of the Ruidoso job that such materials did in fact meet such specifications. Such materials did not in fact meet such specifications and such failure constitutes a breach by the defendants of its contract with the plaintiff under the aforesaid purchase orders.

"9. The defendants expressly represented and warranted to the plaintiff that the pipe, joints, and other materials furnished pursuant to the aforesaid purchase orders were non-infiltratable and conformed to

the requirements of the plans and specifications.

"10. The defendants impliedly warranted to the plaintiff that the pipe, joints, and other materials furnished pursuant to the aforesaid purchase orders were non-infiltratable and conformed to the requirements of the plans and specifications and were fit for the purpose for which they were intended, which purpose was known to the defendant.

"11. The defendants misrepresented to the plaintiff that the pipe, joints, and other materials furnished pursuant to the aforesaid purchase orders were non-infiltratable and conformed to the requirements of the plans and specifications.

"12. After completion of installation of the pipe, joints, and other materials, tests disclosed that the pipe and joints furnished by the defendants were subject to infiltration above the tolerances specified in the plans and specifications, and the plaintiff was required by Wilson & Co., and the Village of Ruidoso to repair and correct the failure of the sewer line to meet contract requirements.

"13. In order to bring the sewer line within the requirements of the plans and specifications, it was necessary for the plaintiff to remove more than 4,000 feet of pipe and to replace same with pipe, joints and other materials meeting plans and specifications. Such work resulted in damage to the plaintiff of $112,426.27 for labor, materials, sub-contracts, and other costs and expenses."

The exhibits to the complaint show purchase orders addressed to Tex. Vit. Supply Co., P. O. Box 117, Mineral Wells, Texas, and on the bottom a notation: "All materials and equipment subject to the Architectural Engineers approval."

The answer shows the true name of "Texas Vitrified Supply Company" to be "Tex-Vit Supply Company" and paragraphs numbered 3, 4, and 7 of the complaint are admitted. As to paragraphs numbered 5 and 6, the answer alleges:

"V. These defendants admit the allegations of paragraph 5 of plaintiff's Complaint, except that the purchase orders referred to in such paragraph, and copies of which are attached to plaintiff's Complaint, are not properly addressed, in that Texas Vitrified Supply Company (Tex-Vit Supply Company) has not at any time sold Jiffy-Joint pipe or joints to the Refinery Engineering Co.

"VI. Texas Vitrified Supply Company (Tex-Vit Supply Company) denies that it has delivered pipe or joints to the Refinery Engineering Co. in regard to the sewer system at Ruidoso, New Mexico, while the defendant, Texas Vitrified Pipe Company, admits that it has delivered pipe and joints to the Refinery Engineering Co. in connection with the construction of the sewer system at Ruidoso, New Mexico. These defendants admit that they have been paid for materials delivered."

The allegations of paragraphs 8 to 13 inclusive of the complaint are denied, and it is alleged in response to paragraphs 12 and 13 that if there was excessive infiltration it was due to improper workmanship of the plaintiff in laying the lines and in backfilling.

The motion for summary judgment is specifically directed to paragraphs 9, 10 and 11 of the complaint and asserts that the deposition of appellant's agent who made the purchase of pipe, joints and materials, shows that the appellant did not rely upon the alleged misrepresentations or the alleged express or implied warranties and that, therefore, as a matter of law, appellant cannot recover.

The judgment recites that the court considered the complaint and other pleadings, the motion for summary judgment and the affidavit filed in opposition thereto, the depositions on file, the answers to interrogatories, and all other matters of record and found therefrom that the motion was well taken.

The points relied upon for reversal are stated as follows:

"I. There are one or more issues as to material facts and award of summary judgment was error.

 A. There is positive evidence of plaintiff's reliance on defendants' representations and warranties.

 B. There is an issue as to the credibility of Verne Snow which only the jury can resolve.

"II. Plaintiff need not prove by direct evidence its reliance on defendants' representations.

 A. Defendants expressly warranted their products.

 B. Reliance on an express warranty need not be proved by direct evidence.

"III. Plaintiff has a cause of action based on breach of contract which was not disposed of by summary judgment."

For the purpose of this appeal it may be said that the following facts are either admitted or are shown by depositions.

The appellant established a New Mexico division office in Farmington in the spring of 1958 with its general manager and agent, Verne Snow, in charge thereof.

The appellees manufacture vitrified clay pipe and associated products at Mineral Wells, Texas, and at all times material hereto employed one Charlie Ward as a sales agent and representative in New Mexico. The pipe of appellants was manufactured with a premolded bell and spigot coated with an asphalt compound which was represented to insure a tight joint when laid and joined in accordance with their instructions. A brochure, printed in April 1957, describing appellees' products under the trade name Jiffy-Joint represented to the public that this pipe allows faster installation, gives better joint performance with lower costs; that the joints contain an asphalt jointing compound accurately taper-formed on both spigot and bell, with exceptionally close tolerances for precise fit and this precision taper assures a perfect seal around the entire circumference of both bell and spigot; that perfect uniformity is assured by the careful factory production of Tex-Vit Jiffy-Joints; that they are cast at the plant and every phase of production is checked by a rigid quality-control system; that when Jiffy–Joints are softened with solvent and pushed home, they actually weld together— provide a permanent, leak-proof seal—all the way around the pipe. This printed brochure further represented that the appel-

lees were "Serving the Great Southwest" and it remained in effect until replaced with a new printing after all of the transactions material hereto.

Charlie Ward first contacted Snow in the spring of 1958 when appellant was preparing to bid on a sewer construction job at Grants, New Mexico. Snow had had no previous experience with or knowledge of appellees' products and while neither of these parties were questioned in their depositions as to whether the printed brochure was furnished to Snow, we think it is reasonable to infer that such was the case. It is admitted that in connection with the Grants job there was a problem of infiltration since the line was to be laid below stream level along a stream bank.

The specifications for the Grants job provided for a permitted maximum infiltration of not more than 500 gallons per day per inch of pipe diameter per mile of line, and the depositions show that Ward made express warranties to Snow that appellees' products would "do the job" that they would "meet the specifications" and that if properly laid there would be no infiltration problems.

The infiltration specification on the Grants job was more or less standard and usual on New Mexico jobs, and was the same as that used on the job at Ruidoso which is involved in this action.

The appellant relied upon the express warranties made by Ward in connection

with the Grants job. They used Ward's prices in making the successful bid and used the appellees' products in the construction of the Grants sanitary sewer system. After construction, an infiltration test was run which indicated that the infiltration was in the neighborhood of not more than 100 gallons per day as against the permitted maximum of 500.

The Grants job was started in May 1958, and thereafter, in June 1958 and in July 1958, appellant, through Snow, purchased relatively small quantities of appellees' products, through Ward, for use on sewer jobs near Grants and in Gallup. These jobs presented no infiltration problems, and in neither case were any further or additional representations made by Ward to Snow regarding the purchased products.

Prior to November, 1958, Wilson & Co., Engineers, were engaged in planning a sanitary sewer system for the village of Ruidoso, and they had no previous knowledge of or experience with Tex-Vit Jiffy-Joint pipe and products. Ward called on the engineers and represented to them that these products would do the job and cited the success at Grants as proof. It may be inferred that through his efforts the engineers included in their specifications a permission for the contractor to use a pre-molded joint pipe. The specifications on the Ruidoso job contained the standard 500 gallon maximum infiltration requirement and Ward and the appellees were familiar with the specifications. The specifications also contained a provision that all materials would be subject to the approval of the engineers.

Snow came to Ruidoso on Saturday before bid letting on the following Monday. He and Ward drove over the ground and discussed various problems connected with the job and in particular the necessity of borrowing backfilling material and the water infiltration problems. Snow had decided before coming to Ruidoso that he would use a premolded joint sewer pipe and preferably Tex-Vit Jiffy-Joint if the price was right. At Ruidoso he secured prices on another premolded joint product known as "Lock Joint." Snow used Ward's prices on Tex-Vit Jiffy-Joint pipe for his bid and was the successful bidder. No conversation occurred between Snow and Ward regarding the quality or character of appellees' products with reference to the Ruidoso job and Ward made no express statements or representations concerning same.

Snow testified several times in his deposition regarding representations but the following testimony substantially covers all that he said in this regard:

"Q. Was it this test that you said and the infiltration test after the job was completed, which you have just testified about that led you to purchase the Jiffy-Joint pipe there for the Ruidoso job?

"A. It was the results that we had had at Grants and that's what sold us on Jiffy-Joint pipe or a premolded joint pipe, and in this particular case, Jiffy-Joint was our selection.

\* \* \* \* \* \*

"Q. I believe your testimony has been that your entire decision to use Jiffy-Joint pipe was based on your past experience of Jiffy-Joint and not any representations made by Charlie Ward or anyone else?

"A. Not at the time the Ruidoso job was done."

Before going to Ruidoso, Snow had heard from employees in his office at Farmington that Wilson & Co., Engineers, had made pressure tests on Jiffy-Joint pipe after it had been put together, but he did not discuss this matter with the engineers. Before placing his order, however, he did talk to the engineers as per his testimony as follows:

"A. \* \* \* After the job was awarded to us, and we told them that we propose to furnish Jiffy-Joint pipe if it met with their approval. The specifications also indicate that the engineers got their approval on any material and they said it was all right with them, that they approved the Jiffy-Joint pipe.

"Q. That conversation was after—

"A. After the award."

The ultimate question for decision is whether the pleadings, depositions and answers to interrogatories before the court disclose, as a matter of law, that the appellant cannot recover damages from the appellees because of the alleged failure of the Jiffy-Joint pipe to meet the infiltration requirements of the specifications. In deciding this question we view the facts in the light most favorable to the appellant and consider whether there are facts or unresolved issues of material facts which will support a recovery by appellant. Ginn v. MacAluso, 62 N.M. 375, 310 P.2d 1034; Pederson v. Lothman, 63 N.M 364, 320 P. 2d 378.

The appellees, in support of the judgment, argue that the undisputed facts show an absence of express warranties or representations made by them to the appellant as an inducement of the sale of their products for the Ruidoso job; that the undisputed facts show that appellant did not rely upon any alleged express warranties or representations made by the appellees in connection with said sale; and that the undisputed evidence also shows an entire lack of reliance by the appellant on any implied warranties which might otherwise have been inherent in the sale.

As we have pointed out, supra, there were no express warranties or representa-

**104**

tions made by Ward to Snow with particular reference to the sale of pipe for the Ruidoso job. This job was of the same nature as the Grants job where express warranties had been made. The Jiffy-Joint pipe to be furnished for the Ruidoso job was the same character of pipe which had been successfully used at Grants. The same printed brochure describing the pipe and its qualities, character and method of manufacture was in effect. The same specification as to infiltration was in effect on both jobs. The appellees cited the successful use of its pipe at Grants to the engineers as proof of its suitability for the Ruidoso job. Under these circumstances we hold that a reasonable inference could be drawn that the express warranties and representations made as an inducement of the sale of the pipe for use at Grants were made as continuing warranties and were in full force and effect as to the sale of the pipe for use at Ruidoso.

■ It is not necessary that the giving of a warranty be simultaneous with the sale. It is enough if it is made under such circumstances as to warrant the inference that it enters into the contract as finally made. Leavitt v. Fiberloid Co., 196 Mass. 440, 82 N.E. 682, 15 L.R.A.,N.S., 855; Reed v. David Stott Flour Mills, 216 Mich. 616, 185 N.W. 715; Free v. Sluss, 87 Cal.App.2d 933, 197 P.2d 854.

■ Appellant does not dispute the assertion by appellees that for a purchaser to recover damages for breach of an express warranty he must show that he relied upon the warranty. We will, therefore, assume this to be a rule of law applicable to this case.

Appellees argue vigorously and at length that Snow's deposition shows an entire lack of reliance on any alleged express warranties. We do not agree with this construction of the effect to be given his testimony. He did say that no express warranties or representations were made to him at Ruidoso concerning Jiffy-Joint pipe, and that his successful experience with the pipe at Grants "sold" him on it for use at Ruidoso, but at no time did he say that he did not rely on warranties and representations made to him by Ward as an inducement of the Grants purchase. In fact, his concluding statement, quoted supra, is entirely consistent with the probability that he did have these prior representations in mind when he purchased the pipe for the Ruidoso job.

■ We approve the statement contained in Vol. 1, Williston on Sales, (Rev.Ed.1948), § 206, pp. 534–535, as follows:

"There is danger of giving greater effect to the requirement of reliance than it is entitled to. Doubtless the burden of proof is on the buyer to establish this as one of the elements of his case. But the warranty need not be the sole inducement to the buyer to purchase the goods; and as a general

rule no evidence of reliance by the buyer is necessary other than the seller's statements were of a kind which naturally would induce the buyer to purchase the goods and that he did purchase the goods.

"It has been said: 'It is true that if an express warranty has been given in express terms as a part of the contract of sale, no proof of reliance thereon would have been necessary. But where a mere representation of fact is proved, as in the case before us, it must be shown to have been relied upon by the vendee in order to constitute a warranty.' It seems undesirable, however, to make the latter part of the statement a matter of law. If a representation was evidently made for the purpose of inducing a sale, and was of a kind appropriate for that purpose and a sale followed, this should be enough."

■ The statements of Snow, that he purchased for Ruidoso on the strength of his previous "experience" and that he did not rely on any warranties or representations made "at the time" of that purchase, do not rule out the reasonable inference which could be drawn from all the circumstances that one of the material inducements for the purchase was the knowledge possessed by Snow of the warranties made to him by Ward on the previous purchase. These warranties constituted a part of his previous "experience" with the pipe at Grants.

■ It is not necessary that a buyer prove reliance on a warranty by direct evidence. It is sufficient if, from the circumstances shown, reliance thereon fairly appears. Worley v. Procter & Gamble Mfg. Co., 241 Mo.App. 1114, 253 S.W.2d 532; Mitchell v. Pinckney, 127 Iowa 696, 104 N. W. 286. Such reliance need not be a total reliance. The buyer may rely on his own judgment as to some matters and the warranty may nevertheless be an inducing cause of the sale. Drager v. Carlson Hybrid Corn Co., 244 Iowa 78, 56 N.W.2d 18; Fossum v. Timber Structures, Inc., 54 Wash.2d 317, 341 P.2d 157; Torrance v. Durisol, Inc., 20 Conn.Sup. 62, 122 A.2d 589; Kurriss v. Conrad & Co., 312 Mass. 670, 46 N.E.2d 12; Mitchell v. Pinckney, supra; Bregman Screen & Lumber Co. v. Bechefsky, 16 N.J.Super. 35, 83 A.2d 804; 77 C.J.S. Sales, § 325.

■ We hold that the trial court erred in deciding that there was no issue of fact for submission to the jury concerning the alleged express warranties and concerning the question as to whether the appellant relied thereon.

As to the implied warranties of merchantability and fitness, and suitability for a particular purpose, we note a remarkable similarity under the facts of this particular case. The appellees were manufacturers of

sewer pipe and connections under the trade name Jiffy-Joint. The pipe was designed for and sold for the usual and ordinary purpose of being used in the construction of sanitary sewer systems in the "Great Southwest," including New Mexico. The standard and usual infiltration requirement on such jobs was that the pipe when laid would not permit infiltration in excess of 500 gallons per day per inch of pipe diameter per mile of line. Thus, in selling their products the appellees impliedly represented that they were merchantable for the usual and ordinary purpose for which they were designed, manufactured and sold and in this case the usual and ordinary purpose was identical with the special purpose, i. e., construction of the Ruidoso sanitary sewer system under specifications known to the appellees to prohibit infiltration in the completed lines in excess of the permitted maximum of 500 gallons per day per inch per mile.

The general rule applicable to the implied warranty of merchantability as applied to sales by manufacturers is stated in 46 Am. Jur., Sales, § 356, p. 542, as follows:

"* * * There also arises from a contract of sale by a manufacturer of an article an implied warranty that such article is merchantable and free from defects rendering it unmerchantable. As the rule is frequently stated, a manufacturer who sells goods of his own manufacture impliedly warrants that they are free from any latent defect growing out of the process of manufacture; * * *."

It has never been contended, to our knowledge, that a buyer must prove reliance on the skill or judgment of the manufacturer in order that he may recover for the breach of an implied warranty of merchantability. The warranty is implied because the manufacturer holds himself out as being skilled in the construction of his products and as being able to manufacture them without latent defects in materials or workmanship. The reasons for the evolution of the implied warranty as applied to manufacturers as distinguished from other sellers are so well and clearly stated in Kellogg Bridge Company v. Hamilton, 110 U.S. 108, 3 S.Ct. 537, 28 L.Ed. 86, that we quote from the opinion rather than attempt a restatement:

"The authorities to which we have referred, although differing in the form of stating the qualifications and limitations of the general rule, yet indicate with reasonable certainty the substantial grounds upon which the doctrine of implied warranty has been made to rest. According to the principles of decided cases, and upon clear grounds of justice, the fundamental inquiry must always be whether, under the circumstances of the particular case, the buyer had the right to rely and necessarily relied on the judgment of the seller and not upon his own. In

ordinary sales the buyer has an opportunity of inspecting the article sold; and the seller not being the maker, and therefore having no special or technical knowledge of the mode in which it was made, the parties stand upon grounds of substantial equality. If there be, in fact, in the particular case, any inequality, it is such that the law cannot or ought not to attempt to provide against; consequently, the buyer in such cases—the seller giving no express warranty and making no representations tending to mislead—is holden to have purchased entirely on his own judgment. But when the seller is the maker or manufacturer of the thing sold, the fair presumption is that he understood the process of its manufacture, and was cognizant of any latent defect caused by such process and against which reasonable diligence might have guarded. This presumption is justified, in part, by the fact that the manufacturer or maker by his occupation holds himself out as competent to make articles reasonably adapted to the purposes for which such or similar articles are designed. When, therefore, the buyer has no opportunity to inspect the article, or when, from the situation, inspection is impracticable or useless, it is unreasonable to suppose that he bought on his own judgment, or that he did not rely on the judgment of the seller as to latent defects of which the latter, if he used due care, must have been informed during the process of manufacture. If the buyer relied, and under the circumstances had reason to rely, on the judgment of the seller, who was the manufacturer or maker of the article, the law implies a warranty that it is reasonably fit for the use for which it was designed, the seller at the time being informed of the purpose to devote it to that use."

We recognized the manufacturer's implied warranty of merchantability in Phares v. Sandia Lumber Company, 62 N. M. 90, 305 P.2d 367; and, in Tharp v. Allis-Chalmers Mfg. Co., 42 N.M. 443, 81 P.2d 703, 117 A.L.R. 1344, we discussed at length with citation of numerous authorities the character, nature and extent of this implied warranty.

This implied warranty is so well known and established so firmly in the common law that we need not burden this opinion by citation of authorities. However, we refer to the Annotation in 135 A.L.R. 1393, where there is a collection of cases showing the applicability of the implied warranty of merchantability to purchases from a manufacturer of goods sold under trade or brand names. See also, 46 Am.Jur., Sales, § 344.

The warranty of merchantability has been defined as meaning "that the thing

sold is reasonably fit for the general purpose for which it is manufactured and sold," Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69, 75 A.L.R.2d 1; and as meaning goods "reasonably suitable for the ordinary uses for which goods of that description are sold," McCabe v. L. K. Liggett Drug Co., 330 Mass. 177, 112 N.E.2d 254; and as meaning a product "reasonably suitable for the ordinary uses it was manufactured to meet," Giant Mfg. Co. v. Yates-American Mach. Co., (8 CCA 1940), 111 F.2d 360.

▬▬▬ An issue is presented by the pleadings as to whether the failure of the pipe on the Ruidoso job was due to latent defects in the pipe or due to poor workmanship and faulty backfilling. Should the appellant's proof show latent defects due to faulty materials or poor workmanship in the manufacture of the pipe rendering the pipe unfit for its ordinary use as sewer pipe on the Ruidoso job under the specifications for that job, there would be an apparent breach of the implied warranty of merchantability. In such case the law does not require proof of reliance upon the skill or judgment of the manufacturer because such reliance is inherent in the transaction of purchase. The defects in such case are hidden, they cannot be discovered until the pipe is laid and tested and they do not inhere in the nature of the manufactured products. Such defects are such as can be guarded against and eliminated by the exercise of ordinary care by the manufacturer in the selection of his materials and in the process of manufacture. Ryan v. Progressive Grocery Stores, 255 N.Y. 388, 175 N.E. 105, 74 A.L.R. 339.

As to defects in the pipe, the appellees do not contend that the appellant could have discovered, prior to installation, that the pipe would not meet the specifications as to infiltration. In answer to an interrogatory they state:

"We have no results on tests of Jiffy-Joint itself as tests cannot be run on a joint until it has been installed and the tests in this situation should have been tests that were made by the plaintiffs themselves after they installed this pipe between each manhole, and which tests we understand were made and it was determined that the infiltration at that time was excessive, but the plaintiffs chose to ignore the results of the tests made and proceed with the same careless method of installation."

We think it should be noted that the appellant, in this court and presumably therefore in the trial court, did not specifically argue the lack of need to show reliance on the skill or judgment of the manufacturer as an essential element of recovery for breach of the implied warranty of merchantability, but nevertheless this is the law and the isue is clearly within the pleadings

and facts as disclosed by the depositions and answers to interrogatories.

The argument of the parties in this court, as to the implied warranty of fitness and suitability of the pipe for use on the Ruidoso job, has been directed to the issue of whether the undisputed evidence shows that appellant did not rely on the skill or judgment of the appellees to furnish a particular kind of pipe which would meet the specifications. Under the facts of this case it is apparent that the pipe was purchased and furnished for the particular purpose of being used on the Ruidoso job and that the appellees had full and complete knowledge of the plans and specifications of the project. It is also apparent that the pipe involved in the transaction was only the standard brand name product manufactured by the appellees for ordinary use, rather than a special pipe manufactured solely or particularly for the Ruidoso job. The question for our decision is whether, under the circumstances of this case, there was an implied warranty that Jiffy-Joint pipe, as usually manufactured by the appellees without defects in materials or workmanship, would be suitable for use in the construction of the Ruidoso sewer system as planned and specified by Wilson & Co., Engineers.

In 46 Am.Jur., Sales, § 351, pp. 536, 537, the general rule is stated:

"* * * In a contract to sell or a sale of exactly described goods

* * * there is no warranty of fitness for any particular purpose other than the purpose for which the article is ordinarily or generally sold even though the buyer states that he is buying for some such particular or extraordinary purpose, *if the buyer does not rely upon the judgment or representation of the seller that the goods are fit for such particular or extraordinary purpose.* The cases apparently hold that where the selection of the article is actually made by the buyer, the foregoing rules apply even though the seller knows that the buyer is purchasing the article for some special use, and induces the contract by trade talk with reference to the general good qualities of the article. * * *

"The fact that a sale is of a known, described, and definite article, or of a specified article by its patent or other trade name, does not, according to most of the cases, preclude an implied warrant of merchantability or fitness for a purpose for which such article is ordinarily or generally sold. On the contrary, it is held in most of the cases that there is such a warranty in such a case." (Emphasis added).

In J. B. Colt Co. v. Gavin, 33 N.M. 169, 262 P. 529, we recognized that there may be an implied warranty of fitness for a particular purpose of a manufactured plant de-

signed to furnish gas for illuminating and cooking, although in that case the question decided was whether this implied warranty could exist in the presence of an express warranty relating to a different subject. To the same effect, see J. B. Colt Co. v. Chavez, 34 N.M. 409, 282 P. 381. In neither of these cases was there any claim of defective workmanship or materials. The machines simply would not serve the particular purposes for which they were sold.

In 59 A.L.R. 1180, there is an annotation on the subject "Implied warranty of fitness on sale of article by trademark, tradename, or other particular description." The annotator states the general rule gleaned from the cases cited in the annotation as follows:

"The raising of an implied warranty of fitness depends upon whether the buyer informed the seller of the circumstances and conditions which necessitated his purchase of a certain general character of article, and left it to the seller to select the particular kind and quality of article suitable for the buyer's use. And this is true without reference to whether the rules of the common law or the Uniform Sales Act apply, except that under the latter act a dealer is placed under the same responsibility as a manufacturer, and the term 'trademark' or 'tradename' is employed, rather than the term 'specific, described article.' Under either rule the major question, in determining the existence of an implied warranty of fitness for a particular purpose, is the reliance by the buyer upon the skill and judgment of the seller to select an article suitable for his needs, and the question as to whether the article was described by its tradename or trademark is not conclusive, if the other conditions exist which would raise an implied warranty of this character. * * *"

The same general rule is stated in 46 Am. Jur., Sales, § 356, and the many cases cited in the annotation and in American Jurisprudence are in entire agreement as to the necessity of a showing of reliance by the buyer on the skill or judgment of the manufacturer to select and furnish goods adapted to the intended use, as a prerequisite of recovery on an implied warranty of fitness for a special or particular use.

In this case we are in agreement with the contention of appellees that no presumption of reliance is present because the testimony of Snow shows beyond question that he determined and decided before entering into negotiations with Ward for pipe to be used on the Ruidoso job that he would use a premolded joint pipe, either "Jiffy-Joint" or "Lock-Joint." The price of the respective products was the determining factor. In either case he intended to purchase a known and brand name product— not a product to be specially manufactured for a particular job. The appellees were

not required to select or manufacture a particular kind of product—merely the usual and ordinary products which they customarily manufactured and sold for use on sewer projects in the "Great Southwest."

 We therefore hold that the alleged implied warranty of fitness of the pipe for the particular purpose of being used on the Ruidoso job is not present in this case.

The appellant contends that the trial court did not consider the fact that the complaint, in paragraph 8, alleged a breach of contract under the purchase orders. It is argued that a genuine issue of a material fact exists in connection with this cause of action—"Did the contract between plaintiff and defendant include the specifications prepared by Wilson & Co.?" Appellant argues that on the facts presently shown in the record it should be concluded that, when appellees submitted their bid for pipe and joints and knew that appellant relied on their bid in making its bid, the appellees intended to be bound by the specifications of the job, and that when appellant's confirming purchase order was issued, "subject to Architectural Engineers approval," it accepted appellees' offer on those terms. Appellant also points to an affidavit, filed in opposition to the motion for summary judgment, asserting the existence of a custom in the contracting industry that a sub-contractor, supplying materials for a job and familiar with the specifications,

impliedly agrees with the prime contractor that his materials shall meet such specifications.

The appellees, in answer to this contention, assert that the claimed action for breach of contract was considered and disposed of by the trial court; that the alleged breach—the failure of the pipe to meet the specifications—is the same alleged breach of the express and implied warranties set forth in paragraphs 9, 10 and 11 of the complaint, to which the motion was directed.

 We now simply hold that the motion for summary judgment was not directed to the action for breach of contract; that there may be facts developed on the trial to support the alleged cause of action; and, that we do not by this opinion or by our decision express any opinion on the merits of this claim. It does seem clear that since the motion was not directed to the absence of any issue of material fact in connection with this claim of breach of contract that the trial court erred in summarily dismissing it with prejudice, and we so hold.

The judgment of the trial court is reversed and this action is remanded with instructions that further proceedings be had in accordance with this opinion.

IT IS SO ORDERED.

COMPTON, C. J., and CARMODY, J., concur.