V. **MUELLER & COMPANY** et al., Appellants,

v.

Albert **CORLEY** et ux., Appellees.

No. 17127.

Court of Civil Appeals of Texas, Houston (1st Dist.).

July 27, 1978.

Rehearing Denied Aug. 24, 1978.

Les Cochran, Houston, for appellants.

Jamail & Kolius, Richard W. Mithoff, Jr., Nat B. King, Houston, for appellees.

EVANS, Justice.

This personal injury action was brought by Mrs. Norma Corley against Dow Corning Corporation, the manufacturer, and V. Mueller & Company, Inc., the distributor of an allegedly defective silicone breast prosthesis which had been used in a surgical procedure performed on Mrs. Corley. The jury answered all issues of negligence and strict liability in favor of Mrs. Corley and awarded the sum of $170,000.00 as damages. Dow and Mueller bring this appeal.

In September, 1972, Mrs. Corley was referred by her family physician to Dr. E. J. Leeves, a general surgeon, for a condition diagnosed as chronic mastitis. Dr. E. J. Leeves then performed a surgical procedure on Mrs. Corley known as "subcutaneous mastectomy with prosthetic replacement" which involved the excision of the breast tissue underlying the skin flap of her breasts and the replacement of the removed tissue with a prosthesis implant. This procedure was performed without any apparent difficulty, but approximately one month afterward, Dr. Leeves observed that the incision site on Mrs. Corley's left breast was not healing properly. After extracting fluid from the wound with a hypodermic and noting what he believed to be the presence of a silastic fluid in the wound, he removed the implant and observed a tear in the "shell" or "envelope" of the prosthesis. Dr. Leeves performed a subsequent surgical procedure and implanted a second silicone prosthesis, but ultimately he was required to remove that implant because the incision again failed to heal. It was the opinion of Dr. Leeves that the presence of silastic fluid in the wound caused the failure of the wound to heal properly.

On this appeal the defendants contend that the evidence is legally and factually insufficient to support the jury's findings that the tear resulted from a defect in the prosthesis or was caused by their negligence; that the trial court erred in refusing certain requested instructions and definitions and also in the admission and exclu-

sion of certain testimony, and that the jury's award of damages is excessive.

Mr. Arthur H. Rathjen, the senior clinical research specialist for the medical products business at Dow, testified that a silicone prosthesis is a shell or envelope made of silicone polymer which has been cured. The shell is molded on a mandrel, and when it is removed from the mandrel, a small hole, "a little less than the size of a quarter", remains in the back of the shell. The hole is patched, the envelope inspected, and a silicone liquid is introduced with a needle through a point in the silicone patch. The prosthesis is then subjected to a curing process which brings the contents of the shell to a gelatinous consistency, and from that point it passes through various quality control steps. It is then packaged, sterilized and placed in "quarantine" for 14 days, after which more tests and samples are made. The product is designed so that the contents inside the shell do not come into physical contact with the body of the recipient. Dow instructs physicians using the product that nothing sharp is to come in contact with the implant because if the envelope is damaged in any way the product is not suitable for use.

Mr. Tom W. Broadhagen, a Dow Quality Assurance Medical Products Unit employee, testified that each individual prosthesis is inspected under a magnifying lens to examine the surface of the envelope. Each patch is examined and pulled to make sure it is on properly. The prosthesis is then subjected to compression testing whereby all gel is squeezed into ½ of the shell, this being done with all four quadrants of the implant under a magnifying lens. If there are any leaks, cuts, or weaknesses in the envelope, the device will rupture during compression testing. Every prosthesis can be traced back to the testing process, the subject prosthesis being one of a lot of 450 which were inspected. Of this lot, 383 prostheses were approved and 67 were rejected. On cross-examination Mr. Broadhagen testified that in order for the prosthesis envelope to develop a tear, it would have to come about as a result of some imperfection on the surface (either a tiny hole, an improper thickness in the shell, or an imperfection imbedded in the shell itself) or as a result of someone cutting or nicking it. He conceded that compression testing was "far from being an exact science" and that the system was not "foolproof." He stated that different amounts of testing pressure would cause the prosthesis to rupture, depending upon the particular defect or weakness involved, but added that such varying pressures would have been well below the threshold of the compression tests conducted at the plant.

Dow represented its silicone prosthesis as being suitable for implantation into the human body and the most reliable restoration procedure to accompany a subcutaneous mastectomy.

Charlotte Seward, the scrub nurse for the surgical procedure on Mrs. Corley, testified that the circulating nurse, Kathy Welch, brought her the package containing the silicone prosthesis. She observed Nurse Welch break the seal on the box, take out the prosthesis and hand it to her. She then passed the prosthesis to Dr. Leeves and observed him place it in the incision in the plaintiff's body. Nurse Seward testified that she did not see Nurse Welch do anything to damage the prosthesis and that she, herself, did nothing to damage it. Nurse Seward did not see Dr. Leeves cut, tear or nick the prosthesis in any way, and from the time the seal on the box was broken until the time the incision was closed, she observed no leakage from the prosthesis.

Dr. Leeves testified that after he had performed the mastectomy on Mrs. Corley, he inserted the prosthesis through a 2½ inch incision below her left breast and then used a "retractor" to cover the prosthesis so it would not be nicked in the suturing process. He examined the prosthesis carefully before its insertion and found no defects. Approximately a month later he found that Mrs. Corley had a separation of the skin at the incision site, and he used a hypodermic to extract fluid from the wound. He felt the fluid after emptying the hypodermic

and was sure that it was silicone although he had no laboratory analysis made. He had never seen free silicone gel before and had no prior experience as to its appearance. When he removed the prosthesis he observed a tear approximately ¼ to ½ centimeter in length.

Dr. Donald R. Sheperd, a board certified clinical and anatomical pathologist, examined the prosthesis after its removal in October, 1972. He found a tear measuring 5 centimeters along one side, but could not say what had caused the tear.

Dr. Frank Gerow, a specialist in plastic surgery, testified on behalf of the defendants. He testified that he and another doctor had been involved in the development of the Dow Corning prosthesis, and since 1963 he had performed "four or 500 hundred or more" surgical procedures involving the implant, of which about 100 were subcutaneous mastectomies. Dr. Gerow testified that he had never seen a spontaneous rupture in a seamless implant such as the one inserted in the plaintiff. Although Dr. Gerow was not permitted to give his opinion as to the cause of the tear in the prosthesis implanted in Mrs. Corley, he was allowed to testify as to possible risks. He testified that an implant could be torn by a surgeon in the wound closing process and that even using a shield or retractor, a potential existed for tearing because "you can catch the edges of the implant along the side of the malleable." He also testified that silicone gel was too viscous a substance to be manually aspirated through a hypodermic needle of the size used by Dr. Leeves.

The jury was submitted issues under theories of both strict liability and negligence. In response to the strict liability issues, the jury found that "the form or material or performance of the prosthesis in question" rendered it defective as manufactured and that such defect was a producing cause of the occurrence. In response to the negligence issues, which were accompanied by an instruction on res ipsa loquitur, the jury found that the failure of the "form or material or performance" of the prosthesis was due to the negligence of the defendants and that such negligence was a proximate cause of the occurrence.

■ It was the plaintiff's burden under either theory of recovery to prove the defective condition of the product at the time it left the control of the manufacturer or seller. *Jack Roach-Bissonnet, Inc. v. Puskar*, 417 S.W.2d 262 (Tex.1967); *Bass v. General Motors Corp.*, 491 S.W.2d 941 (Tex. Civ.App.—Corpus Christi 1973, writ ref'd n. r. e.). It was not essential that the plaintiff identify the specific engineering or structural cause of the defect. *Bell Aerospace Corp. v. Anderson*, 478 S.W.2d 191 (Tex.Civ. App.—El Paso 1972, writ ref'd n. r. e.). However, the plaintiff was required to trace the defect to the manufacturer. *Coca Cola Bottling Co. v. Hobart*, 423 S.W.2d 118 (Tex.Civ.App.—Houston [14th Dist.] 1967, writ ref'd n. r. e.).

■ The evidence shows that the prosthesis reached the hospital in a sealed, sterilized container. There was testimony that the prosthesis was not damaged by the nurses or the physician from the time it was taken from the sealed container until it was placed in a Mrs. Corley's body, and Dr. Leeves denied that he had cut or nicked the prosthesis during the suturing process. Dr. Leeves testified:

"Q. From the time it was removed from the sealed container by Nurse Welch to the time it was placed in the body of Mrs. Corley, did you see anyone mishandle the prosthesis in any way?

"A. No, Sir.

"Q. Was it nicked, cut or scraped or misused in any way?

"A. No, Sir.

"Q. Were your eyes on it the entire time?

"A. Yes, Sir.

"Q. From the time it was removed from its sealed container until it was placed in her body?

"A. Yes.

&ast; &ast; &ast; &ast; &ast; &ast;

"Q. Did you at any time nick, touch or scratch the prosthesis with any surgical instrument?

"A. Not to my knowledge.

"Q. At any time?

"A. Not to my knowledge.

"Q. If you had done so, would it have come to your attention?

"A. Yes."

Dr. Leeves further testified that he carefully examined the prosthesis before inserting it in the body opening and that he turned it over and observed all sides. He saw no tear or holes in the envelope, and it was in good condition as far as he could ascertain. In order to thread the envelope into the opening, it was necessary that he "squeeze it down" because it was larger than the opening. If there were a defect in the envelope, it should have become apparent when the prosthesis was compressed, and he did not observe any imperfection.

The defendants contend that this testimony constitutes direct evidence that the prosthesis was free from defect at the time it was inserted in the body opening, and that the only reasonable inference which could be made from the evidence is that the tear had been caused by a nick or puncture during the surgical process.

The jury was at liberty to make this inference, as contended by the defendants, but it was not bound to do so. There was also testimony which indicated that after a prosthesis had been implanted in a person's body, it was subject to a certain amount of pressure. If the person should sleep on her stomach or should bump into something, this might create sufficient pressure to bring about a rupture if there were some imperfection in the envelope. The degree of pressure required to rupture the envelope varied according to the nature of the imperfection and the type of pressure applied, and even though Dow's testing procedures were designed to identify an imperfect prosthesis, its system was not foolproof.

It was for the jury to weigh the evidence and to accept that testimony which it found to be most credible. Although there was no direct evidence tracing the defect to the manufacturer, the fact that the product failed to function properly after being implanted in the plaintiff's body was a matter which the jury could consider as circumstantial proof of an original defect. *General Motors Corp. v. Hopkins*, 548 S.W.2d 344, 349–50 (Tex.1977). A product defect may be established by circumstantial evidence. *Darryl v. Ford Motor Co.*, 440 S.W.2d 630 (Tex.1969).

The jury could have concluded from the evidence that the prosthesis was designed to maintain its integrity as a flexible, tissue-like "bubble" during the rigorous stresses of human activity. Based upon the testimony that the prosthesis left the manufacturer and passed from the distributor to the physician in a sealed and sterilized container and that it was handled with care and was not damaged during the surgical procedure, the jury could have concluded that the product underwent no change from the time it left the control of the manufacturer until the surgery was completed. Although the jury might have reached a different conclusion in its consideration of the evidence, it could reasonably have concluded from the circumstances before it that the tear in the envelope resulted from an imperfection in the product itself, rather than from the nature of its handling during the surgical process. Thus, the evidence supports the jury's inference that the product was defective at the time it left the hands of the manufacturer. *Pittsburg Coca Cola Bottling Works v. Ponder*, 443 S.W.2d 546 (Tex.1969); *McKisson v. Sales Affiliates, Inc.*, 416 S.W.2d 787 (Tex.1967). The defendants' points of error contending that there is no evidence and insufficient evidence to support the jury's findings are overruled.

■ The defendants' points of error directed at the court's charge must also be overruled. The defendants' requested instructions with respect to "new and independent cause" and "sole proximate cause" had relevance only to the negligence issues, and any error on the part of the trial court must be considered harmless in light of the jury's affirmative answers to the strict liability issues. *Houston Transit Co. v. Zim-*

*merman*, 200 S.W.2d 848, 852 (Tex.Civ.App. —Galveston 1947, writ ref'd n. r. e.). Since the jury found that the defect in the prosthesis was a producing cause of the occurrence in question, the plaintiff was entitled to judgment based solely upon that theory of recovery. *General Motors Corp. v. Hopkins*, supra; Sales & Perdue, The Law of Strict Tort Liability in Texas, 14 Houston L.Rev. 1, p. 59 (1977).

■ The trial court properly defined the term "defective," instructing the jury that a product was defective which exposed its user to an unreasonable risk of harm, making the product dangerous "to an extent beyond that which would be contemplated by the ordinary *user*." The defendants sought an instruction to the effect that the term defective meant a product which would be unreasonably dangerous to the user and that the term "unreasonably dangerous" meant the product was dangerous "to the extent beyond that which would be contemplated by the ordinary *physician*." The defendants argue that a prosthesis is a specialized medical product, requiring the exercise of a physician's skill and judgment in the determination of its use, and that the physician, rather than the user, would be required to determine whether the product exposed the user to an unreasonable risk of harm.

The defective condition in the prosthesis in question rendered it unreasonably dangerous to Mrs. Corley, not to her physician, Dr. Leeves. The appropriate question for the jury, therefore, was whether the defective condition was one which was not contemplated by the user, the "ultimate consumer." Restatement (2d) of Torts § 402 A (1965). The trial court properly keyed its instructions to the mind of the person who would be injured by the dangerous condition of the product. *Helicoid Gage Division of American Chain & Cable Co. v. Howell*, 511 S.W.2d 573, 578 (Tex.Civ.App.—Houston [14th Dist.] 1974, writ ref'd n. r. e.).

■ Over the defendants' objection, the trial court permitted the plaintiff's witness, Dr. Donald Sheperd, to testify with respect to the injurious nature of the silicone gel which formed the center of the prosthesis. Dr. Sheperd testified that the material could cause a reaction of the surrounding tissues and that it would inflame and irritate the tissues if it was allowed to come out of the envelope. Dr. Sheperd admitted that he did not know what material was in the envelope, only that it was "some kind of compound that is very flexible and gooey." The defendants contend that Dr. Sheperd was not qualified to give an expert opinion regarding the effect of the prosthesis material on surrounding tissues and that the trial court's error in admitting his testimony, coupled with its error in excluding certain testimony of their expert witness, Dr. Gerow, was calculated to and probably did result in the rendition of an improper judgment.

Dr. Gerow testified that during his research, first with animals and later with human beings, involving the use of "free" silastic gel, he had not observed any different reaction in the surrounding tissues than he had observed with the implant intact. In his experience, he had observed "a condition of redness" and "a slow healing wound, a condition of inflammation," which, he stated, were caused either by a developing infection or by some diminished blood supply to the wound.

The trial court sustained the plaintiff's objection to a hypothetical question posed to Dr. Gerow, seeking his opinion as to "the possible cause" of the tear in the prosthesis in question. On bill of exception Dr. Gerow responded to this question by stating that all of the tears he had seen were the result of a "direct suture puncture" of the prosthesis during the surgical procedure.

The trial court indicated to counsel that Dr. Gerow would be permitted to testify as to the risks involved in the procedure, but would not be allowed to give his opinion as to the cause of the tear in question. Dr. Gerow then proceeded to testify before the jury that during his surgical career he had observed tears in silicone prostheses caused by the surgical process and that such tears usually occurred or had "the potential" to occur during the suturing process. The su-

ture "can go through the wound edge and can very easily catch the implant and put a tear in it." The use of a malleable retractor "may or may not help" during the suturing process because even using such a shield, the physician can still catch the edges of the implant along the side of the malleable. Furthermore, after the retractor is removed toward the end of the closing process, the prosthesis is vulnerable without the protection of the shield. In the course of his experience, Dr. Gerow had never seen a spontaneous rupture with a seamless prosthesis implant.

The testimony of Dr. Gerow, which was permitted to go before the jury, clearly reflects his view that a rupture in a seamless prosthesis implant would likely have been the result of a nick or puncture occurring during the surgical process. Dr. Gerow's testimony before the jury is similar to and has the same import as his testimony which was excluded, and the record does not reflect that the trial court abused its discretion in excluding the testimony offered. *Green v. Houston Belt & Terminal Ry. Co.*, 558 S.W.2d 127, 128 (Tex.Civ.App.—Houston [14th Dist.] 1977, no writ). Considering the record in its entirety this court cannot determine that the cumulative effect of the trial court's rulings constitutes reversible error. Rule 434, Texas Rules of Civil Procedure; *Galveston H & S. A. Ry. Co. v. Smith*, 100 Tex. 267, 98 S.W. 240 (1906).

The defendants also contend that the jury's award of $170,000.00 is so excessive that it shows the jury was improperly motivated by passion and prejudice, and a remittitur of $120,000.00 is requested.

The evidence shows that Mrs. Corley was required to undergo four surgical procedures, two of which were caused by the failure of the tissue to heal under the prosthesis implant in her left breast. After the incision failed to heal after the second procedure, Dr. Leeves concluded that he would not insert a third prosthesis because of adverse psychological consequences to Mrs. Corley. He prescribed anti-depressant drugs while Mrs. Corley was having prob-

lems with the prosthesis immediately after the surgery. Mrs. Corley testified that approximately a week and a half after the initial surgery her left breast became inflamed and was painful, and since she was allergic to most painkilling drugs she had to take a synthetic drug which did not do very much good. She experienced more pain after the second prosthesis was inserted and had to return to Dr. Leeves to have the skin resutured because the sutures ruptured and were bleeding. She then underwent "another type of resuture, sort of like extra skin grafting" and finally the second prosthesis had to be removed. Mrs. Corley now has no part of her breast remaining on the left side and she is taking anti-depressant medication. She testified that she is embarrassed by her condition and feels like people are always looking at her. Mr. Corley testified that prior to the surgery his wife was outgoing and "very pleasant to be around" but since that time, she has withdrawn and "stays at home and doesn't care about going anywhere or about being with people."

In determining whether a verdict is excessive the courts must review only that evidence which is favorable to the award, and the jury's findings will not ordinarily be disturbed if there is evidence to sustain the award. *Hammon v. Stricklen*, 498 S.W.2d 356, 363 (Tex.Civ.App.—Tyler 1973, writ ref'd n. r. e.). A verdict based largely on pain and suffering is an area in which the jury's findings must be given special weight. *Monsanto Co. v. Milam*, 480 S.W.2d 259, 268 (Tex.Civ.App.—Houston [14th Dist.], aff'd 494 S.W.2d 534 (Tex. 1973). Considering the record in its entirety, the jury's award is not so excessive as to shock the court's sense of justice nor does it indicate the jury's verdict was improperly motivated by passion, prejudice or other improper motive. Thus, the verdict will not be disturbed. *World Oil v. Hicks*, 129 Tex. 297, 103 S.W.2d 962 (1937).

The trial court's judgment is affirmed.