662 P.2d 646

Lynne F. PERFETTI, Plaintiff-Appellee,

v.

McGHAN MEDICAL, a foreign corpora-
tion, Defendant-Appellant.

No. 5673.

Court of Appeals of New Mexico.

March 3, 1983.

Certiorari Denied April 14, 1983.

Leland S. Sedberry, Jr., Judy A. Fry, Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque, for defendant-appellant.

- Kenneth E. Wagner, Franchini, Henderson & Wagner, Albuquerque, for plaintiff-appellee.

## OPINION

WOOD, Judge.

Plaintiff, subsequent to a subcutaneous mastectomy, had difficulty with the skin adhering to the rib cage. After evaluation by the surgeon for breast reconstruction, a decision was reached to insert a mammary prosthesis under the skin and this was done. The type of prosthesis used was a high volume double lumen; the inner envelope was filled with gel, the outer envelope was filled with saline solution. The surgeon felt that this type of prosthesis was superior to other types. Approximately 25 months after the prosthesis was implanted, the prosthesis in the left breast deflated. When the prosthesis was removed, examination revealed a split at the edge of the prosthesis "about a half inch on the front and half an inch on the back." Deflation occurred because the saline solution had leaked. The prosthesis had been manufactured by defendant. Plaintiff sued for damages; three theories of liability were submitted to the jury, which returned a verdict for plaintiff. Defendant appealed. We discuss the issues on the basis of the three theories of liability: (1) products liability, (2) express warranty, and (3) implied warranty.

Defendant contends, as to each theory of liability, that the evidence was insufficient for submission to the jury, and that its motion for a directed verdict at the close of all the evidence should have been granted. *Archuleta v. Pina*, 86 N.M. 94, 95, 519 P.2d 1175 (1974), states:

> In ruling on a motion for a directed verdict, the trial court must view the evidence, together with all reasonable inferences deducible therefrom, in the light most favorable to the party resisting the motion, and must disregard all conflicts in the evidence unfavorable to the position of that party.

Thus, as to each theory, defendant asserts the evidence was insufficient to raise a jury issue as to its liability.

### 1. Products Liability

Although holding that lessors as well as sellers could be liable, *Stang v. Hertz Corporation*, 83 N.M. 730, 497 P.2d 732 (1972), 52 A.L.R.3d 112 (1973), approved the basis for products liability stated in Restatement (Second) of Torts § 402A (1965). Section 402A states:

> Special Liability of Seller of Product for Physical Harm to User or Consumer
>
> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>
> (a) the seller is engaged in the business of selling such a product, and
>
> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

■ A. Defendant claims that plaintiff failed in her burden of proof because there was no evidence that the prosthesis was defective at the time it left the hands of the manufacturer. The requirement of "defective condition" appears in § 402A; the requirement that the defect exist at the time it left defendant's hands appears in Comment g to § 402A.

Defendant states: "The evidence is undisputed that the ... prosthesis was not defective at the time it was inserted in Plaintiff", referring us to the surgeon's testimony as to his inspection of the prosthesis before inserting it. The surgeon also testified:

I feel that the capsule which forms around the implant allows the implant to get a little fold in it.... And over a period of months to years, the implant gradually wears back and forth and eventually that little fold wears through and you get a little tear.... That is the kind of thing that I've seen in almost every prosthesis which has deflated that I've seen that had a problem.... And that's what I saw in Miss Perfetti's case.

Citing *V. Mueller & Co. v. Corley,* 570 S.W.2d 140 (Tex.Civ.App.1978), plaintiff asserts that the jury could infer that a defect existed when it left defendant's hands because the prosthesis deflated 25 months after insertion.

These arguments are misdirected because they are concerned with the existence of a *physical* defect in the prosthesis when it left defendant's hand, and because no theory of physical defect was submitted to the jury.

The "defect" issue submitted to the jury was that defendant "failed to adequately warn the Plaintiff of the unreasonable risk of injury to her." Comment h to § 402A states that where the seller "has reason to anticipate that danger may result from a particular use ... he may be required to give adequate warning of the danger ... and a product sold without such warning is in a defective condition." This view of a defect was followed in *First Nat. Bk., Albuquerque v. Nor-Am Agr. Prod., Inc.,* 88 N.M. 74, 85, 537 P.2d 682 (Ct.App.1975):

Where the manufacturer has reason to anticipate danger from a particular use of his product, an adequate warning must be given. A product sold without such a warning is in a "defective condition unreasonably dangerous...."

Because no issue of *physical* defect was submitted to the jury, the failure to direct a verdict on that ground was not error; the sufficiency of the evidence as to a physical defect is a false issue. Accordingly, we do not reach the question of whether, under the evidence, it could properly be inferred that a defect existed 25 months prior to the time the defect was known to exist. *See* Annot., 54 A.L.R.3d 1079 at 1090 (1973); *compare* the "subsequent declarations" discussed in *Matter of Estate of Martinez,* 96 N.M. 619, 633 P.2d 727 (Ct.App.1981).

■ B. Defendant asserts that the prosthesis comes within the category of unavoidably unsafe products discussed in Comment k to § 402A. This comment was applied in *Hines v. St. Joseph's Hospital,* 86 N.M. 763, 527 P.2d 1075 (Ct.App.1974). The comment applies to "products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use." The comment continues:

Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous.... The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and de-

sirable product, attended with a known but apparently reasonable risk.

There is no evidence of an improper design and no direct evidence of an improper manufacture. There is evidence that the prosthesis had a known risk of leakage, that the prosthesis was not guaranteed for long-term results by any manufacturer, and that the benefits obtainable from use of the prosthesis outweighed the risk of leakage. On this basis, defendant asserts the prosthesis came within Comment k to § 402A, and that the only issue involves the "warning". Plaintiff responds that the prosthesis cannot be properly categorized as an unavoidably unsafe product.

This is another false issue. The jury was instructed on the prosthesis as an unavoidably unsafe product, *see* U.J.I.Civ. 14.19, N.M.S.A.1978 (1980 Repl.Pamph.), without objection from plaintiff. There is no issue in this case concerning the propriety of the instruction. Rule of Civ.Proc. 51(I), N.M.S.A.1978 (1982 Cum.Supp.).

■ However, even if there were an issue, the trial court properly instructed concerning unavoidably unsafe products. Comment k to § 402A has been applied to intrauterine contraceptive devices. *Terhune v. A.H. Robins Co.,* 90 Wash.2d 9, 577 P.2d 975 (1978); *McKee v. Moore,* 648 P.2d 21 (Okl.1982). Under the evidence, Comment k to § 402A applied to the mammary prosthesis.

■ C. Defendant contends that (1) it fulfilled its duty to warn or, in the alternative, (2) that no warning was necessary.

(1) The duty to warn, in this case, has two aspects. The first aspect is concerned with whether the prosthesis was defective. We pointed out, in 1A above, that the theory of a defect submitted to the jury was that defendant had reason to anticipate the danger (deflation) from use of the prosthesis and that a failure to give an adequate warning resulted in the product being in a defective condition. There is substantial evidence that defendant knew of the danger of deflation. The issue as to a defective product is whether the warning was "ade-

quate". The second aspect is concerned with defendant's theory that the prosthesis was an unavoidably unsafe product. Such a product is neither defective nor unreasonably dangerous if the warning was "proper".

The parties dispute as to whom the warning was due—plaintiff or her surgeon. The evidence is uncontradicted that federal law restricted this prosthesis "to sale by or on the order of a licensed physician"; that plaintiff had no contact with defendant and received no warning from defendant. *Terhune v. A.H. Robins Co., supra,* states: "[A] manufacturer of a product ... which is obtainable only through the services of a physician, fulfills its duty if it warns the physician of the dangers attendant upon its use, and need not warn the patient as well." *See Hines v. St. Joseph's Hospital, supra; McKee v. Moore, supra.*

Defendant claims that the jury "instructions indicated that the manufacturer's duty to warn was to plaintff [sic] ... ." This is factually inaccurate. In language similar to the above quotation from *Terhune v. A.H. Robins, Inc., supra,* the jury was instructed that the duty to warn was fulfilled if the manufacturer "warns the physician, and it need not warn the patient as well."

Concerning the evidence as to an "adequate" or a "proper" warning, defendant states: "It is uncontroverted that McGhan's package insert, which was seen by ... [the surgeon], warned of the risk of leakage." That the surgeon was warned, generally, of the danger of deflation, does not dispose of the warning issue.

The jury was instructed, consistent with U.J.I.Civil 14.18, N.M.S.A.1978 (1980 Repl. Pamph.), that an "adequate" warning must disclose the nature and extent of the danger. The Committee Comment to U.J.I.Civil 14.18 points out that the adequacy of a warning is ordinarily a question of fact.

In this case the trial court could have ruled that there was no factual issue as to the adequacy or properness of defendant's warning as to the nature and extent of the danger, and that the warning was deficient

as a matter of law. Although the surgeon knew generally of the danger of deflation, he had only minimum knowledge of delayed deflation at the time the prosthesis was implanted. The surgeon expected the prosthesis to last from 10-to-15 years and would not have used the prosthesis if he had been aware of the danger resulting from wear due to a fold in the prosthesis. A witness for defendant testified there is a 20-to-30 percent incidence of capsular contracture where there has been a subcutaneous mastectomy, that the manufacturer was aware that folding and rubbing of the prosthesis was foreseeable as a result of capsular contracture and that no warning was given as to this problem. Defendant got more than the evidence supported when the issue of the sufficiency of the warning was submitted to the jury.

■ (2) The jury was instructed that there was no duty to warn of danger actually known to the user of the product. *See* U.J.I. Civ. 14.15, N.M.S.A.1978 (1980 Repl. Pamph.). In this case there would be no duty to warn the surgeon if he actually knew of the danger.

Defendant contends that the surgeon knew of the danger of deflation and thus had no duty to warn the surgeon. Inasmuch as the issue of the surgeon's knowledge was submitted to the jury, defendant's contention, necessarily, is that there was no evidentiary conflict as to the surgeon's knowledge, and the trial court should have ruled, as a matter of law, that there was no duty to warn.

Defendant's claim is based on the surgeon's general knowledge of the danger of deflation and that deflation could occur at any time. This mistakes the danger involved and, thus, the warning that was required. Defendant's duty was to warn of the nature and extent of the danger of a leak developing because of wear of the prosthesis at a fold resulting from capsular contracture. There was a factual question for the jury as to the surgeon's knowledge of this danger; the trial court could not have properly ruled on the surgeon's knowledge as a matter of law.

Defendant's contentions concerning the products liability theory are without merit.

*2. Express Warranty*

Section 55–2–313(1), N.M.S.A.1978, states:

(1) Express warranties by the seller are created as follows:

(a) any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise;

(b) any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description;

(c) any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

U.J.I. Civil 14.28, N.M.S.A.1978 (1982 Cum.Supp.), is the approved jury instruction which deals with the requirements of § 55–2–313(1). U.J.I. Civil 14.28, as given to the jury, included the provisions of § 55–2–313(1)(c), although there was no factual basis for an express warranty based on "sample or model". However, no issue is raised concerning over-instructing. The issue is whether there was evidence of an express warranty under § 55–2–313(1)(a) which was breached; specifically, whether there was "any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain" which was breached. As we explain subsequently, any such affirmation of fact is regarded as part of the description of the goods, thus involving § 55–2–313(1)(b).

■ In considering these two questions—the existence of the warranty and its breach—we are not concerned with the absence of any statement by defendant to plaintiff. Any express warranty made with respect to the surgeon would inure to plaintiff's benefit on the basis that the surgeon

was acting as plaintiff's agent in the use of the prosthesis. *Putensen v. Clay Adams, Incorporated,* 12 Cal.App.3d 1062, 91 Cal. Rptr. 319 (1970).

█ Also, in considering the two questions, we are not concerned with the "reliance" issue raised by defendant. The "reliance" discussed in *Vitro Corp. of America v. Texas Vitrified Supply Co.,* 71 N.M. 95, 376 P.2d 41 (1962), did not involve "reliance" under New Mexico's version of the Uniform Commercial Code (UCC). "Reliance" under § 55–2–313 is discussed in the "Official Comment" to the UCC which follows § 55–2–313. That comment is persuasive authority. *First State Bank at Gallup v. Clark,* 91 N.M. 117, 570 P.2d 1144 (1977).

> Official Comment 3 to § 55–2–313 states: [A]ffirmations of fact made by the seller about the goods during a bargain are regarded as part of the description of those goods; hence no particular reliance on such statements need be shown in order to weave them into the fabric of the agreement.

Thus, if there is an affirmation of fact which is a part of the basis of the bargain, there is no independent "reliance" requirement as to that affirmation of fact.

█ Plaintiff's claim of an express warranty, stated in the jury instructions, reads: "The Defendant, through its publications, expressly warranted this product [the prosthesis] to be fit for the use that it was intended: to-wit, implantation in the Plaintiff. The publications involved were a "flyer" issued by defendant, and defendant's "package insert" within the box containing the prosthesis. Both publications had identical items involving the question of "fit for the use that it was intended".

One of the items reads:

**Warranty**

McGhan Medical Corporation warrants that reasonable care was used in the manufacture of these products, and will replace at no charge any product that McGhan Medical Corporation feels was defective at the time of shipment.

There is no dispute that this item was an express warranty; there is no claim that this warranty was breached.

The second of the items reads:

**Warning**

McGhan Medical Corporation is aware of the potential for leakage in inflatable implants over an undefined time period. Considering the chemical and physical properties of the material used in the manufacture of the inflatable implants, *deflation is not expected. However, long term results cannot be guaranteed by the manufacturer.* [Our emphasis.]

Defendant contends this second item does not amount to an express warranty. Plaintiff contends an express warranty exists in the words emphasized at the end of the quotation, and disregards the preceding part of the quotation.

Plaintiff asserts that the emphasized portion of the quotation is an affirmation of fact or promise to the bargain and, thus, the express warranty issue was properly submitted to the jury. We disagree, for two reasons.

The first reason is that plaintiff disregards what is affirmed. The affirmation consists of all of the quotation; plaintiff cannot limit the express warranty issue to words taken out of context. *Payne v. Tuozzoli,* 80 N.M. 214, 453 P.2d 384 (Ct.App. 1969). The affirmation is that:

(a) There is a potential for leakage over an undefined period of time.

(b) Deflation, due to the chemical and physical properties of the material used, is not expected.

(c) Although deflation is not expected, long-term results are not guaranteed.

Assuming, but not deciding, that these affirmations were part of the bargain, and thus amounted to an express warranty, there is no evidence that the affirmations were breached. The prosthesis did deflate within an undefined period of time; the only evidence is that deflation was not due to the chemical or physical qualities of the material used, but from the wearing through of a fold in the prosthesis, and if 25

months was not a "long term", the prosthesis did not last for a long term.

Plaintiff contends that the negation of long-term results implies that defendant warranted results for a time period less than that of a long term. Whatever the meaning of "long term", the affirmation also negates less than a long-term result; it is affirmatively stated that leakage can occur over an *undefined period of time.*

If the affirmation amounted to an express warranty, there is no evidence of a breach of this warranty.

■ The second reason is that the affirmations must be a part of the bargain, or, in the words of U.J.I. Civil 14.28, it must be fair to regard the affirmations "as part of the contract". Official Comment 1 to § 55–2–313 points out that express warranty rests on "dickered" aspects of the individual bargain and go clearly to the essence of the bargain. *Compare Lovington Cattle Feeders v. Abbott Lab.,* 97 N.M. 564, 642 P.2d 167 (1982).

The surgeon testified that he was aware of the warning quoted above; however, he also testified that the warning did not enter into his decision to use defendant's prosthesis. The surgeon testified that he normally used Surgitech's implants and "had no reason to use anyone else's".

A The reason that I used the McGhan implant in Miss Perfetti's case was because of her insurance coverage and because of the type of insurance that she had. I was not only unsure of whether my bill would be paid at all or how much of it would be paid, but I was unwilling to take the risk that they may not be willing to pay for the implant. Therefore, I elected to use an implant which was supplied by the hospital. And at that time the hospital was purchasing McGhan implants for implantation and that's the reason that I used the McGhan implant.

There is no conflicting evidence.

The surgeon's testimony is to the effect that, not only was there no "dickered" as-

pects, the affirmations were not part of any bargain between defendant and the surgeon. *See Stang v. Hertz Corporation,* 83 N.M. 217, 490 P.2d 475 (Ct.App.1971), *rev'd on other grounds,* 83 N.M. 730, 497 P.2d 732 (1972). Further, there is no evidence that the affirmations were part of the bargain between defendant and the hospital; thus, we do not reach the question of whether the surgeon might be the beneficiary of an express warranty to the hospital. *See* § 55–2–318, N.M.S.A.1978, discussed subsequently in 3C in connection with an implied warranty.

There being no evidence of an express warranty that was breached, the trial court erred in submitting the express warranty issue to the jury.

### 3. Implied Warranty

■ The jury was instructed, *see* U.J.I. Civil 14.29 and 14.31, N.M.S.A.1978 (1982 Cum.Supp.), on two theories of implied warranty—of merchantability (defective and not fit for the ordinary purpose for which the product is used), U.J.I. 14.30[3], N.M.S.A.1978 (1982 Cum.Supp.), and § 55–2–314(2)(c), N.M.S.A.1978, and of fitness for a particular purpose (unsuitable for the particular purpose for which purchased), U.J.I. 14.32, N.M.S.A.1978 (1980 Repl.Pamph.), and § 55–2–315, N.M.S.A.1978. These warranties are implied by law; they are independent of any express warranty by the seller to the buyer. U.J.I. Civil 14.29 and 14.31.

A. Defendant contends there should have been no instructions on implied warranty. It relies on the following excerpts from the Committee Comment to U.J.I.Civ. 14.28 and 14.30.

Comment to U.J.I.Civ. 14.28:

[T]he committee believes that these breach of [implied] warranty instructions are best suited to cases involving purely commercial losses.

Most courts and commentators have been unable to state a rational distinction between the merchantability standard of 55–2–314 NMSA 1978 and the comparable

standard in strict liability of § 402A of Restatement (Second) of Torts.

Comment to U.J.I. Civil 14.30:

The question which has received considerable discussion is whether, in a personal injury case, strict liability in tort and breach of the implied warranty of merchantability are comparable standards.... [I]n the context of a personal injury action, there would seem to be little difference between the two standards as applied in the courts. It is precisely for this reason that the committee suggests use of the tort standard in personal injury cases and use of the merchantability standard in commercial cases.

■■ Defendant is incorrect in urging a congruence between products liability and the implied warranty of fitness for a particular purpose. Products liability requires a defect (see 1A of this opinion); the implied warranty of fitness for a particular purpose does not require a defect. *See* U.J.I. Civil 14.32.

■■ Defendant is correct in urging that, in a personal injury case, the products liability claim and the claim concerning the implied warranty of merchantability may be identical. *Foster v. Ford Motor Co.,* 621 F.2d 715, 719 (5th Cir.1980), states: "The negative implication of the warranty requirement that goods be 'fit for the ordinary purposes for which such goods are used' is that the goods not be unreasonably dangerous." Both claims require a defect. *See* § 402 A quoted in 1A of this opinion and U.J.I.Civ. 14.30[3]. In this case the identical defect is relied on for both products liability and breach of the implied warranty of merchantability.

Where the identical defect is relied on to support both theories of liability, submission of both theories would seem to permit the jury to consider the same liability twice simply by utilizing two terminologies. *Compare Alexander v. Delgado,* 84 N.M. 717, 507 P.2d 778 (1973); *Williamson v. Smith,* 83 N.M. 336, 491 P.2d 1147 (1971). On the other hand, the submission of two liability theories on the basis of one defect may be better judicial administration than requiring an either/or situation engendering appeals as to which was the applicable theory.

The question is one of policy to be established by the Supreme Court. Approved jury instructions, without limitations on their use, indicate Supreme Court policy. As the Committee Comment to U.J.I. Civil 14.30 recognizes, both causes of action are available to plaintiff. This Court must follow the approach authorized by the Supreme Court. *Alexander v. Delgado, supra.*

Defendant also contends that instructions on both products liability and the implied warranty of merchantability were confusing to the jury. It relies on the Committee Comment to U.J.I. 14.30: "[T]he use of two instructions and terminologies to define the same thing may well be confusing to the jury." The instructions given cannot be held to have confused the jury; the "merchantability" instructions were separate from the products liability instructions, and neither the merchantability nor the products liability instructions refer to the other.

The claim that no instructions should have been given on implied warranty is without merit.

■■ B. Defendant asserts that there was no evidence of breach of an implied warranty of merchantability.

Defendant attacks the sufficiency of the evidence concerning the merchantability requirement that the product "pass without objection in the trade under the contract description". Section 55–2–314(2)(a). This is another false issue; no such theory was submitted to the jury.

Defendant also attacks the sufficiency of the evidence concerning the merchantability requirement that was submitted to the jury—"fit for the ordinary purpose(s) for which such product is used ... ." Defendant relies on the testimony that at the time of use of the prosthesis in this case *all* mammary prostheses had the possibility for leakage, that even with the potential for leakage, the prosthesis was in fact used for

its intended purpose. Such is a one-sided view of the evidence. The surgeon testified:

> If I was implanting something into a patient that was going to require considerable expense to the patient and considerable operation to the patient and a period of getting over the operation, I would hope that when I put it in there it was going to last probably for a life time. And if not, for a life time, at least 10 to 15 years.
>
> \*   \*   \*   \*   \*   \*
>
> At that time [of the implantation] I wasn't even aware of the benefits versus the deficiencies in the implant and if I had had in my mind any idea that these implants would not have stood up better than they obviously had, I wouldn't have used it to begin with, period.

The prosthesis failed after 25 months. There was a jury question as to whether the prosthesis was fit for the ordinary purpose for which such product is used.

■ C. Defendant claims that an implied warranty of merchantability requires privity of contract, see § 55–2–314, that there is no evidence of a contract between plaintiff and defendant, or a contract between the surgeon (plaintiff's agent) and defendant. "McGhan's contract (and privity) was with the hospital".

Defendant also contends that neither plaintiff, nor the surgeon, is among those to whom the benefits of a warranty are extended by § 55–2–318. We agree that warranty benefits were not extended to plaintiff or the surgeon by § 55–2–318; however, this statute does not dispose of the privity issue.

The UCC proposed three alternatives for extending warranty benefits. See 1 Anderson, Uniform Commercial Code § 2–318:2 (2d ed. 1970). Section 55–2–318 is alternative A, the first alternative. Comment 3 to § 55–2–318 states:

> The first alternative expressly includes as beneficiaries within its provisions the family, household and guests of the purchaser. Beyond this, *the section in this form is neutral and is not intended to enlarge or restrict the developing case law on whether the seller's warranties, given to his buyer who resells, extend to other persons in the distributive chain.* [Our emphasis.]

Thus the question, without regard to § 55–2–318, is whether there must be privity between the surgeon, plaintiff's agent, and defendant in order for defendant to be liable for breaching the implied warranty of merchantability.

A definite divergence of opinion exists as to whether privity should or should not be required. Examples are cited in *Western Equipment v. Sheridan Iron Works,* 605 P.2d 806 (Wyo.1980) (Wyoming amended its statute). In 1978, Pennsylvania reversed its position and joined the fast growing list of jurisdictions cited that eliminated the privity requirement in suits by purchasers against remote manufacturers for breach of implied warranty. *Kassab v. Central Soya,* 432 Pa. 217, 246 A.2d 848 (1968).

Extensive citation of authority is unnecessary. McGhan relies only on *Haragan v. Union Oil Company,* 312 F.Supp. 1392 (D. Alaska 1970). In response, we refer to *Morrow v. New Moon Homes, Inc.,* 548 P.2d 279 (Alaska 1976), where reference is made to *Haragan. Morrow* cited the divergent opinions and joined those jurisdictions which allowed purchasers to assert their warranty theories free from the confines of privity. For another scholarly presentation of this subject matter, see *Santor v. A and M Karagheusian, Inc.,* 44 N.J. 52, 207 A.2d 305 (1965), 16 A.L.R.3d 670 (1967).

We hold that defendant may be held liable for breach of implied warranty of merchantability under the UCC without regard to privity of contract between defendant and either plaintiff or her surgeon. This is consistent with the treatment of privity in negligence actions. *Holland v. Lawless,* 95 N.M. 490, 623 P.2d 1004 (Ct.App.1981) and cases therein cited.

■ D. Defendant claims there was no evidence of a breach of an implied warranty of fitness for a particular purpose. This

contention relies on *Vitro Corp. of America v. Texas Vitrified Supply Co., supra,* for the requirements of this warranty. The discussion of express warranty pointed out that *Vitro* was a pre-UCC decision. Our concern is with the statutory warranty of fitness for a particular purpose.

Section 55–2–315 states:

Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section [55–2–316 NMSA 1978] an implied warranty that the goods shall be fit for such purpose.

The statutory provisions are explained in the comments. Comment 1 states:

Whether or not this warranty arises in any individual case is basically a question of fact to be determined by the circumstances of the contracting. Under this section the buyer need not bring home to the seller actual knowledge of the particular purpose for which the goods are intended or of his reliance on the seller's skill and judgment, if the circumstances are such that the seller has reason to realize the purpose intended or that the reliance exists. The buyer, of course, must actually be relying on the seller.

Comment 2 states:

A "particular purpose" differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question.

The Committee Comment to U.J.I. 14.31 states:

The seller must have reason to realize the purpose intended for the goods and that the buyer is relying on the seller's skill or judgment, but actual knowledge of the particular purpose is not required.

A factual question concerning the existence of the warranty was raised by evidence that the hospital purchased the *mammary* prosthesis from defendant and supplied that prosthesis to the surgeon for use as a *mammary* prosthesis; the warranty does not require that defendant have actual knowledge that the prosthesis would be implanted in the plaintiff.

Defendant asserts there is no evidence that the surgeon, as plaintiff's agent, relied on defendant's skill or judgment. We agree; the evidence is that the surgeon relied upon the hospital. The evidence that the hospital purchased the prosthesis from defendant for use as a mammary implant is evidence of the hospital's reliance; the hospital's reliance extends to the surgeon, who was in the distributive chain. *See* discussion at 3C.

Three theories of liability were submitted to the jury which returned a general verdict. The express warranty issue should not have been submitted to the jury. We do not know on what basis the jury found liability. Under these circumstances the judgment in favor of plaintiff is reversed; the cause is remanded for a new trial which excludes the theory of express warranty. *Gerety v. Demers,* 86 N.M. 141, 520 P.2d 869 (1974).

Defendant is to bear its appellate costs. Rule of Civ.App.Proc. 27(a), N.M.S.A.1978.

IT IS SO ORDERED.

HENDLEY, J., concurs.

BIVINS, J., concurs in part and dissents in part.

BIVINS, Judge (concurring in part, dissenting in part).

I agree with the majority's decision as to express warranty, but disagree as to strict liability and implied warranties of merchantability and fitness for a particular purpose. These issues will be discussed under the same general headings as appear in the majority opinion.

The discussion which follows accepts the majority holding that Comment k to

§ 402A, *Restatement (Second) Torts,* applies to the mammary prosthesis, not because the evidence necessarily supports it, but because the jury was instructed on the prosthesis as an unavoidably unsafe product without objection. Plaintiff presents a persuasive argument as to why Comment k should apply only to life-sustaining products; however, that issue as well as whether it is even proper to instruct on both Comment k and § 402A cannot be decided on this appeal.

1. Products Liability

A. Physical defect.

The majority says that since no theory of physical defect separate and apart from the product's unavoidably unsafe character was submitted to the jury, failure to direct a verdict on that ground is a false issue. I agree that physical defect was a false issue, but disagree that this theory was not submitted to the jury.

The trial court instructed the jury that the plaintiff claimed the defendant was subject to products liability for putting on the market a product which had a "defect." The claimed defects, according to the instruction, were:

1. That the mammary implant which was placed in the plaintiff failed in that it leaked into her body and deflated within twenty-five (25) months from the date that it was surgically implanted in her chest.

2. That the defendant failed to adequately warn the plaintiff of the unreasonable risk of injury to her.

The trial court also instructed the jury under U.J.I.Civ. 14.22, N.M.S.A.1978 (1980 Repl.Pamph.) that in order for the supplier to be liable, the injury must have been proximately caused by "a condition of the product which was not substantially changed from the condition in which the (particular) supplier placed the product on the market...." Further, the court instructed on circumstantial evidence. Read together the trial court did, in my opinion, submit to the jury the theory of physical defect. Moreover, that issue was strenuously argued by both sides on the defendant's motions for directed verdict, which the trial court denied.

Thus, the question of whether there was substantial evidence that the prosthesis was physically defective when it left the hands of the manufacturer is squarely before us and should be decided.

While several possible causes for the prosthesis failure were offered, there appears to be no real disagreement as to the most probable cause. Plaintiff's surgeon testified, "I feel that the capsule which forms around the implant allows the implant to get a little fold in it like that. And over a period of months to years, the implant gradually wears back and forth and eventually that little fold wears through and you get a little tear.... That is the kind of thing I've seen in almost every prosthesis which has deflated.... And that's what I saw in Miss Perfetti's case." Plaintiff in her brief says this testimony as to cause is "unequivocal."

Thus, we are not dealing with the type of situation presented in *Lovington v. Cattle Feeders v. Abbott Lab.,* 97 N.M. 564, 642 P.2d 167 (1982), *V. Mueller & Co. v. Corley,* 570 S.W.2d 140 (Tex.Civ.App.1978) or *Springer Corp. v. Dallas & Mavis Forwarding Co.,* 90 N.M. 58, 559 P.2d 846 (Ct.App. 1976). In those cases there was no direct evidence as to what caused the failure. Here there was. Therefore, there was no need to resort to circumstantial evidence to prove the failure.

Nor are we concerned with whether that failure resulted from a defect in design, that issue having been withdrawn. Given the fact that deflation can occur from wear caused by the fold and that in this case such happened within 25 months after insertion, is that fact alone sufficient to draw an inference that this particular prosthesis had an imperfection and that the imperfection existed when it left the defendant's hands? There is no evidence that this particular prosthesis failed sooner than others, or that there was any estimated life for a product of this kind. The surgeon testified that

there was minimal evidence that a long-term complication of delayed deflation would occur, because there had not been a sufficient number of implants over a long period to make any statistical evaluations. The fact that the surgeon may have hoped that the prosthesis would last a lifetime or at least 10 to 15 years does not mean that he expected it to last that long. The mere fact that the prosthesis failed is not proof of a defect and raises no presumption of defectiveness. *Gates v. Ford Motor Company,* 494 F.2d 458 (10th Cir.1974). The lapse of 25 months from implant to failure, absent other circumstances, was insufficient to prove the existence of a physical defect in the product at the time it left the defendant's hands. *See Springer Corp.,* 90 N.M. at 60, 559 P.2d 846. To permit the jury, in the face of the evidence in this case, to draw such an inference was error.

### B. Unavoidably unsafe product

The majority concludes that under the evidence Comment k to § 402A applied to the mammary prosthesis. As noted, an unavoidably unsafe product, properly prepared, and accompanied by proper directions and warning is neither defective nor unreasonably dangerous. Since, in my view, physical defect should have been withdrawn, the "properly prepared" element is not present in this case. Nor are we concerned with proper directions. This leaves the question of whether the prosthesis was accompanied by a proper warning. The majority states that "such a product is neither defective nor unreasonably dangerous if the warning was 'proper'."

Because a warning under the facts of this case was unnecessary, I do not discuss whether the warning was adequate.

As noted by the majority, since this product under federal law is obtainable only through the services of a physician, the defendant fulfills its duty if it warns the physician of the danger attendant upon its use. *Hines v. St. Joseph's Hospital,* 86 N.M. 763, 527 P.2d 1075 (Ct.App.1974); *Terhune v. A.H. Robins Co.,* 90 Wash.2d 9, 577 P.2d 975 (1978). The physician, in turn, has a duty to disclose dangers to the patient. *Hines, supra.* It is also his duty to take into account the propensities of the product and the susceptibilities of the patient and make an informed decision. *Dalke v. Upjohn Co.,* 555 F.2d 245 (9th Cir.1977).

If the surgeon in this case had actual knowledge of the danger, then there was no duty to warn. *See First Nat. Bk., Albuquerque v. Nor-Am Agr. Prod., Inc.,* 88 N.M. 74, 537 P.2d 682 (Ct.App.1975). Appreciation of some risk is not sufficient; in order to relieve the manufacturer of the duty to warn, the user must be aware of the nature and extent of the danger. *See Trujillo v. Uniroyal Corp.,* 608 F.2d 815 (10th Cir.1979). The majority answers defendant's contention that the surgeon knew of the risk of deflation and that deflation could occur anytime by saying, "[D]efendant's duty was to warn of the nature and extent of *the danger of a leak developing because of wear of the prosthesis at a fold resulting from capsular contracture"* (emphasis added).

As I view the surgeon's testimony, he did know of that risk. First, as to capsular contracture:

Q Doctor, before—Excuse me, before you go any farther, would you explain to the Jury what a capsular contraction is, please?

A These prosthetic devices which are inserted in the chest wall are a foreign body and the body normally walls this prosthetic device off by forming a capsule around it. This capsule is made out of fibrous tissue. In some patients, the capsule which forms around the implant tends to contract down and squeeze down upon the implant making it feel firmer than normal. This is a fairly common occurrence especially in people that have had subcutaneous mastectomys [sic] which Miss Perfetti had had. And this is one of the things that we were concerned about happening in the post-operative period. And when Miss Perfetti came in on 8/21/78, I noticed that her left breast was firmer than her right breast.

As to the expectancy of capsular contracture:

**658**

Q So, that's not just a possible complication, the incapsulation is definitely going to happen. It's the contracture part of it that is a possible complication; is that correct?

A That's correct.

Q What do you mean by the contracture part of it?

A. At the present time, we're not quite sure what causes the contracture. There appear to be a number of causes and a number of ways that this can occur, but basically in a percentage of people who have this operation, the capsule tends to contract down around the implant and when that happens, if the contracture is assymetrical, [sic] it just pulls and it sticks out like a big orange or grapefruit and the breast becomes firmer than normal. If the capsular contraction is assymetric, [sic] it can pull the breast medially or down or up or laterally. If the capsular contracture is severe on the chest wall side, it can cause pain and discomfort in the chest wall in addition to firmness.

As to what happened to plaintiff:

A. Here it is. In the prosthesis [sic] which I have seen that have deflated, secondary to a, what I call a fatigue crack, for want of a better term, all look the same and I have removed a number of prostheses with the same kind of a linear tear in them. I have my own opinion as to what causes it. I feel that the capsule which forms around the implant allows the implant to get a little fold in it like that. And *over a period of months to years,* the implant gradually wears back and forth and eventually that little fold wears through and you get a little tear. It shows up as a—when you look at it, as a linear crack in the prosthesis and that's why the fluid leaks out. *That is the kind of thing that I've seen in almost every prosthesis which has deflated that I've seen that had a problem. That's the kind of thing that I almost always see.* And that's what I saw in Miss Perfetti's case. I have had some prostheses which leaked secondary to a defective valve and—but in this case it wasn't a defective valve and those are the only 2 kinds of defla-

tions that I ever have had. One, when the valve was defective and you could see the fluid coming out through the valve. And the kind where you've got a little tiny crack in the shell. (Emphasis added)

What did the surgeon tell plaintiff before implanting the prosthesis?

Q And what did you tell her about the time limit as far as when and inflation might occur following putting the implant in?

A I told her that deflation could occur at two times. That occasionally and rarely, there could be an early leak in the prosthesis either secondary to a defective valve or some injury which might have occurred at the time of the insertion, but was unrecognized by me and if that should have happened, then the implant would deflate soon after surgery within usually a week to 2 months after insertion. That if it didn't deflate initially, there was the long term risk of deflations which could occur *at any time after insertion,* but may occur for years after it's been put in there. (Emphasis added).

Referring to the "folding," the surgeon again acknowledged his awareness:

Q And this is a problem that you are aware of in the medical profession, you don't rely upon the detailmen to tell you about the medical problems, do you?

A I usually don't depend on them.

The fact that the surgeon may have hoped that the prosthesis would have lasted for a lifetime or at least 10 to 15 years does not alter the fact that he knew deflation from folding could occur "at anytime after insertion." Because the surgeon had actual knowledge of the risk, there was no duty to warn. Therefore, this issue should not have been submitted to the jury.

2. Express Warranty

I concur with the majority for the reasons given.

3. Implied Warranty

The initial inquiry is: having held it proper to apply Comment k of § 402A to

the prosthesis, was it proper to have instructed on warranties? In *McMichael v. American Red Cross,* 532 S.W.2d 7 (Ky. 1975) the court quoted from two other jurisdictions:

In *Balkowitsch v. Minneapolis War Memorial Blood Bank, Inc.,* 270 Minn. 151, 132 N.W.2d 805 at 811 (1965), the court said:

" * * * Moreover, it seems to us that under the facts in the case before us it would be unrealistic to hold that there is an implied warranty as to qualities of fitness of human blood on which no medical or scientific information can be acquired and in respect to which plaintiff's physician has the same information, knowledge, and experience."

We refer again to *Jackson v. Muhlenberg Hospital,* 96 N.J.Super. 314, 232 A.2d 879 (1967), its expression of the view that the concept of strict liability, whether in tort or on implied warranty, rests in substantial part on the theory of the existence of an implied representation by the seller that the product is safe, and its holding that in the case of blood containing hepatitis virus, where the producer could not know or control the condition, "there is no implied representation that the blood is free of the virus."

Assuming implied warranties have a place in cases where the product is unavoidably unsafe, was it proper to instruct the jury under the facts here?

### A. Merchantability

In order for there to be a breach of warranty of merchantability, the jury was instructed that the prosthesis must have been defective and unfit for the ordinary purpose for which it is used. Having reached the conclusion that the prosthesis was not defective nor unreasonably dangerous under strict liability, it follows that the product was not unfit for the ordinary purposes for which it is used under § 55–2–314, N.M.S.A.1978 (1980 Repl.Pamph.). *See Springer Corp.,* 90 N.M. 58, 559 P.2d 846. As to comparability of standards between strict liability in tort and implied warranty

of merchantability, see Committee Comment, U.J.I.Civ. 14.30, N.M.S.A.1978 (1982 Cum.Supp.). Implied warranty of merchantability should not have been submitted to the jury.

### B. Fitness for a particular purpose

Breach of warranty fitness for a particular purpose is not applicable to this case. For § 55–2–315, N.M.S.A.1978, to apply there must be reliance on the seller's skill of judgment to select or furnish suitable goods. Defendant asserts that there was no evidence that the surgeon relied on defendant's skill or judgment. The majority agrees, but says the surgeon relied on the hospital; that the purchase by the hospital alone is evidence of its reliance; thus, the hospital's reliance extends to the surgeon who was in the distributive chain. In my judgment this conceptual leap cannot be made. The surgeon relied on his own judgment as to the particular prosthesis selected, i.e., a high volume double lumen mammary prosthesis. He did not select a single lumen or any other variety. There is no evidence that the hospital did anything other than supply the prosthesis, which it purchased from defendant. The fact that the surgeon used a different brand than he had customarily used is of no consequence; he exercised his own skill and judgment and did not rely on defendant in making that selection. *See Fear Ranches, Inc. v. Berry,* 470 F.2d 905 (10th Cir.1972). Absent reliance, the instruction based upon § 55–2–315 should not have been submitted.

I concur with the result reached as to express warranty. Since there was no substantial evidence to support strict liability or implied warranties of merchantability or fitness for a particular purpose, I would remand with directions to dismiss. The majority being of the opposite view, I respectfully dissent.